## George P. Housh v. State of Nebraska.

### Filed January 2, 1895.    No. 6926.

1. **Homicide.**  Evidence examined, and *held* sufficient to sustain the verdict of manslaughter.

2. ———: Instructions.  An instruction in a prosecution for murder to the effect that the jury may, if the evidence warrants, convict of murder in the first degree, murder in the second degree, or manslaughter, is not objectionable on the ground that it excludes a verdict of acquittal and requires the jury to convict of a felonious homicide, particularly where in other paragraphs they are cautioned against conviction unless satisfied of the guilt of the prisoner beyond a reasonable doubt.

3. ———: ———: "Malice."  It is proper to instruct that "malice," in its legal sense, denotes that condition of. mind which is manifested by the intentionally doing of a wrongful act without just cause or excuse.  It means any willful or corrupt intention of the mind.

4. ———: Justification.  The bare belief of one assaulted that he is about to suffer death or great bodily harm will not of itself justify him in taking the life of his adversary.  There must exist reasonable ground for such belief at the time of the killing, and the existence of such grounds is a question of fact for the jury.

5. ———: Weight of Prisoner's Testimony.  It is not error in a trial for murder to instruct that the jury may take into consideration the interest of the prisoner in weighing his evidence. (*St. Louis v. State*, 8 Neb., 405.)

6. **Instructions.**  Mere non-direction by the trial court affords no ground for the reversal of a judgment unless proper instructions have been asked and refused. (*Hill v. State*, 42 Neb., 503.)

**7. New Trial:** NEWLY-DISCOVERED EVIDENCE. It is not error to refuse a new trial on the ground of newly-discovered evidence when the statements, in the affidavit upon which it is based, are contradicted by the sworn evidence of the proposed witness.

ERROR to the district court for Antelope county. Tried below before ROBINSON, J.

*N. D. Jackson,* for plaintiff in error, cited: Wharton, Criminal Law [9th ed.], secs. 488, 489; *Clark v. State,* 32 Neb., 246; *Long v. State,* 23 Neb., 51; *Billings v. State,* 107 Iud., 54; *Gandy v. State,* 23 Neb., 448.

*Geo. H. Hastings, Attorney General, contra,* cited: *Gallagher v. State,* 3 Minn., 185; *People v. Williams,* 32 Cal., 280; *People v. Campbell,* 30 Cal., 312; *Rasberry v. State,* 1 Tex. App., 664; *Stewart v. State,* 1 O. St., 66; *People v. Anderson,* 44 Cal., 65; *State v. Quin,* 3 Brev. [S. Car.], 568; *People v. Doe,* 1 Mich., 451; *Patten v. People,* 18 Mich., 314; *Cotton v. State,* 31 Miss., 504; Horrigan & Thompson, Cases on Self-Defense, 476; *Oliver v. State,* 17 Ala., 587; *Dupree v. State,* 33 Ala., 380; *State v. Benham,* 23 Ia., 154; *State v. Burke,* 30 Ia., 331; *Noles v. State,* 26 Ala., 31; *Reg. v. Bull,* 9 C. & P. [Eng.], 22; *Dill v. State,* 25 Ala., 15; 1 Bishop, Criminal Law, secs. 842, 843; *Davis v. State,* 31 Neb., 240; *Parrish v. State,* 14 Neb., 60; *State v. Vance,* 17 Ia., 138; *State v. Scott,* 4 Ired. [N. Car.], 409; *Atkins v. State,* 16 Ark., 568; *Shorter v. People,* 2 Com. [N. Y.], 193; *State v. Horne,* 9 Kan., 120; 1 Wharton, Criminal Law, sec. 102; *Curry v. State,* 4 Neb., 552; *Palmer v. State,* 4 Neb., 68; *Schlencker v. State,* 9 Neb., 242; *Milton v. State,* 6 Neb., 143; *Carr v. State,* 23 Neb., 755; *Vollmer v. State,* 24 Neb., 844; *Commonwealth v. York,* 9 Met. [Mass.], 104; *Creek v. State,* 24 Ind., 151; *State v. Collins,* 32 Ia., 36; *Patterson v. People,* 46 Barb. [N. Y.], 625; *State v. Matthews,* 78 N. Car., 523; *Steinmeyer v. People,* 95 Ill., 383; *State v. Rose,* 30 Kan., 501; *Panton v.*

*People,* 5 Am. Crim. Rep. [Ill.], 425, note; *Barnards v. State,* 88 Tenn., 229; *White v. Territory,* 3 Wash. Ter., 397; *St. Louis v. State,* 8 Neb., 405.

POST, J.

The facts of this case must have appealed strongly to the sympathies of the jury, as they certainly do to ours. On the day of the homicide the prisoner, a small and feeble man, weighing less than 135 pounds, and a cripple, his left leg having been amputated above the knee, was three times assaulted by the deceased, a man weighing nearly 200 pounds. On each occasion the prisoner was thrown to the ground and violently choked by the deceased, who was at the time intoxicated, and who during one of such assaults is shown to have threatened the prisoner's life. The only apparent provocation for said assaults, or any of them, was the fact that the prisoner had denounced the action of the deceased in striking and otherwise abusing Ernest Staples, a boy sixteen years of age, who at the time in question had business at the livery stable where the altercation occurred, and who had, by some means not disclosed, excited the enmity of the deceased. On releasing the prisoner after the last assault, the deceased followed the boy above named to where the latter was in the act of unhitching his horse, about forty feet from the stable. After punishing the boy to his satisfaction he started to return to the stable along the sidewalk at a right angle therewith, pushing and kicking the boy before him. When he reached the stable door the prisoner, who was standing just inside the threshold, struck him a blow in the neck with a knife, completely severing the jugular vein, and from which death resulted almost instantly. The theory of the state is that the prisoner, incensed by the wrongs he had suffered, followed the deceased to the door and, waiting for his return, struck the fatal blow without warning and without sufficient provocation. On the other hand the prisoner contends that in tak-

ing the life of the deceased he was acting in self-defense and upon sufficient provocation. There is evidence tending to prove that he was at the fatal moment resting against the cheek or casing of the door, engaged in adjusting the wooden leg to his limb, which was rendered necessary in consequence of the violence just suffered at the hands of the deceased. He accounts for the presence of the knife at the instant of homicide by the fact that it was necessary to make a hole in the strap used to support his wooden limb, and which was broken during the scuffle. The witnesses for the prisoner and some of those for the state testify that as the deceased approached the door he was commanded by the prisoner to let the boy alone. The deceased then rushed at him, but was ordered to stand back or he would get hurt. At that time, according to the same witnesses, the deceased was about four feet from the prisoner with his hand raised as if about to strike. According to the testimony of the latter the deceased had something in his hand which was believed to be a knife, and being unable to retreat on account of the injuries just suffered, there was no alternative but to defend himself by use of the means employed. Other witnesses, evidently not unfriendly to the prisoner, testify that he was standing with his left hand on the door casing and his right hand, in which he was holding the knife, behind him, and as he ordered the deceased to stand back he took one step forward and struck with the result stated. The question of justification was submitted to the jury on the foregoing evidence, and while a verdict of acquittal would perhaps have been quite as satisfactory to the trial court, we can perceive no ground for interference. The question whether there existed in the mind of the prisoner an apprehension based upon reasonable grounds therefor of imminent peril to life or limb through the further assault of the deceased, and whether the means adopted for his defense were reasonable and appropriate for that purpose, in view of all the circumstances

surrounding him at the time, is essentially one of fact. No mere difference of opinion between the judge and the jury will warrant the setting aside of a verdict based upon conflicting evidence.    There is a wide distinction between such a case and one in which there is a failure of proof upon a material issue or where the verdict is so clearly wrong as to lead irresistibly to the conclusion that it is the result of prejudice, passion, or inattention to the evidence. It cannot, therefore, be said that the judgment is so clearly against the evidence as to call for a reversal of the judgment on that ground.    The conclusion renders necessary an examination of the other assignments of error.

2. Exception is taken to paragraph No. 5 of the instructions given by the court on its own motion, as follows: "In a prosecution for murder in the first degree, if the evidence fails to sustain such charge, the jury may, if the evidence warrants, find the defendant guilty of murder in the second degree, or manslaughter, as the case may be."    The particular criticism of this instruction is that it is incomplete, since the jury were thereby allowed no alternative but to convict either of murder or manslaughter and not permitted to render a verdict of acquittal.    The criticism is, however, not merited, as the jury were in other paragraphs instructed fully and accurately upon the subject, and in explicit terms directed to acquit unless satisfied beyond a reasonable doubt that the killing was not justifiable on the ground of self-defense.

3. The next exception is directed to instruction No. 11, viz: "'Malice,' in its legal sense, differs from the meaning which it bears in common speech.    In common acceptation it signifies ill-will, hatred, or revenge toward a particular individual.    Such a condition of mind would, of course, constitute malice in the eye of the law, but such is not necessarily its legal sense.    'Malice,' in its legal sense, denotes that condition of mind which is manifested by the intentionally doing of a wrongful act without just cause or

excuse. It means any willful or corrupt intention of the mind." The above definition of "malice," it is argued, is incomplete, but we regard it as substantially within the definition in *Harris v. State*, 8 Tex. App., 90, and which was approved in *Carr v. State*, 23 Neb., 749. It is certainly not in conflict with the authorities cited by REESE, J., in the last named case, and possesses merit which cannot unfortunately be claimed for every instruction which we have had occasion to examine, viz, brevity and perspicuity.

4. The next assignment involves the following instruction: "You are instructed as a matter of law that when a person is assaulted by another, and from the nature of the attack, viewed in the light of any previous threat or hostile declaration made by the assailant and of his known character for violence, the party assaulted has reasonable grounds to believe and does believe that the assailant intends presently to take his life or do him some bodily injury, he will be justified in killing his assailant, providing the circumstances are such that such extreme measure would seem to the comprehension of a reasonable man necessary in such situation to prevent the threatened injury. Whether the appearances of danger are sufficient to convince a reasonable man in the situation of the accused that death or the infliction of great bodily harm upon the person of the accused was intended by the deceased is a question of fact for the jury." The criticism of the foregoing proposition is stated with great force and precision in the brief submitted by counsel for the prisoner, from which we quote as follows: "It [the instruction] requires the jury to measure the defendant's mental responsibility, not by his own standard, but by that of some ideal or imaginary man,  *  *  * whereas the true inquiry is, did the defendant believe, at the time the fatal blow was struck, that the deceased intended to kill him or do him great bodily harm?" The view thus stated has, it is admitted, the sanction of eminent authority (see Wharton, Criminal Law [9th ed.], 488, 489),

although it has not been generally accepted as the law by the courts of this country or England. The doctrine of the instruction has not only been accepted by the courts, but it rests upon reasons obviously sound and productive of the best interests of society as well as justice to the accused. The principle which underlies the rule there stated is that human life should not be made to depend upon conditions só unreliable and hazardous as the bare belief of any man that he is in danger of death or bodily harm; for, as said in *State v. Harris*, 1 Jones, Law [N. Car.], 190,—a well considered case,—"if the person charged with the homicide is to judge for himself whether the reasonable ground existed the most atrocious murders may be committed with impunity. The prisoner says he believed his life was in danger. Who can look into his heart? If the law allows him to judge, who can contradict him? The circumstances are nothing. It is his belief that justifies him. The law is not so. It is only from circumstances accompanying the transaction that reasonable ground can be ascertained, and of their bearing and influence the jury are the sole judges." The following are selected from the many cases in harmony with the above: *People v. Coughlin*, 67 Mich., 466; *State v. Sterrett*, 68 Ia., 76; *State v. Archer*, 69 Ia., 420; *State v. Bohan*, 19 Kan., 28; *Davis v. People*, 88 Ill., 350; *Watson v. State*, 82 Ala., 10; *Penland v. State*, 19 Tex. App., 365; *Clifford v. State*, 58 Wis., 477; and like views were expressed, although the question was not decided, in *Parrish v. State*, 14 Neb., 60, and *Vollmer v. State*, 24 Neb., 844. The objection to the instruction is, therefore, without merit.

5. Exception was taken to the following paragraph of the instructions: "Under the law of this state the accused is a competent witness in his own behalf and you are bound to consider his testimony; but in determining what weight to give to his testimony you may weigh it as you would the testimony of any other witness, and you may take into

consideration his interest in the result of the trial, his manner, and the probability or improbability of his testimony, and giving to his testimony such weight as, under all the circumstances, you think it entitled to." Were the question an open one at this time the writer would with reluctance sanction a practice which permits any reference by the court to the subject of the prisoner's credibility as a witness. There is on principle no more reason to call the attention of the jury to him and to caution them to consider his interests as affecting his credibility than for like caution with respect to any other witness; but that question has been fully settled in this court by decisions in conformity with the practice in this case, which we are constrained to follow. (See *St. Louis v. State*, 8 Neb., 405; *Murphy v. State*, 15 Neb., 383.)

6. It is next contended that the court erred in not further defining manslaughter. The only definition of that offense is found in instruction No. 8, which is practically in the language of the statute; but the jury were properly instructed respecting the crime charged, and advised that malice is an essential element of murder, both in the first and second degree. They were also advised that they might, if the evidence warranted, find the defendant guilty of manslaughter. In other words, the court charged that if the killing was unlawful and malicious, it was murder; but if it was unlawful and without malice, the offense was manslaughter. That, we think, a sufficient direction when assailed for the first time after verdict, particularly in view of the fact that the only reliance of the prisoner was justification on the ground of self-defense. The killing, according to the verdict, was not justifiable, hence it was unlawful, and was, therefore, murder or manslaughter; and as the conviction was for the last named offense, there is no apparent ground for complaint on his part. No definition of manslaughter has been suggested in the argument, nor can we conceive of one which adds anything to the precise definition of the statute, viz., the unlawful killing of another

Housh v. State.

without malice, either in a sudden quarrel or unintention-
ally while the slayer is engaged in the commission of an
unlawful act.  But the record shows no exception to the
charge on that ground.  If, in the opinion of the prisoner,
he was entitled to a more explicit direction upon any sub-
ject, he should have submitted proper instructions, and if
refused, the question would have been thus presented for
review.  Mere non-direction, as said in *Hill v. State*, 42
Neb., 503, affords no ground for reversal of a judgment
unless proper instructions have been asked and refused.
*Long v. State*, 23 Neb., 51, cited in support of a different
view, is not in point, since the duty of the trial court to in-
struct in the absence of a request therefor was not con-
sidered in that case.

7. Finally, it is claimed that the motion for a new trial
should have been sustained on account of newly-discovered
evidence.  According to the affidavit of the prisoner, he
had, subsequent to the trial, discovered that he could prove
by one Roan that the latter had witnessed the killing from
the middle of the street in front of the stable and distinctly
saw the deceased raise his right hand as if about to strike
the affiant with a knife which he then held.  On the hear-
ing of the motion the witness above named was produced
by the state and upon his examination contradicted the
prisoner in every particular.  He not only denied witness-
ing the homicide, but swore that he was in the city of Nor-
folk at the time in question.  From other evidence taken
at the time we are led to believe that said witness had de-
liberately imposed upon the prisoner by falsely stating that
he, witness, was present and could give material evidence
in his favor.  But that fact merely proves how base and
entirely unworthy of belief is the witness by whose evi-
dence it is sought to change the result of the trial,—an ad-
ditional reason for the refusal to disturb the verdict.  We
find no error in the record, hence the judgment is

AFFIRMED.