### FRANK MAXFIELD V. STATE OF NEBRASKA.

FILED MARCH 3, 1898. No. 9525.

1. **Instructions: REASONABLE DOUBT.** An instruction in a criminal prosecution is not erroneous which defines a reasonable doubt as being such a doubt as arises from a candid and impartial consideration of all the evidence in the case, and which would cause a reasonable and prudent man to pause and hesitate in the graver transactions of life, and that a juror is satisfied beyond a reasonable doubt if from a consideration of the entire evidence he has an abiding conviction of the truth of the charge.

2. ———: **NON-DIRECTION.** Mere non-direction by the trial judge affords no ground for the reversal of a criminal cause unless a proper instruction has been tendered and refused.

3. **Rape: EVIDENCE.** To justify a conviction of rape the proof must reach such a degree of certainty as to exclude a reasonable doubt.

4. ——: ——. A conviction of rape will not be sustained where the testimony of the prosecutrix as to the principal fact relied upon to sustain the charge is not only uncorroborated, but is so contradictory as to be self-destructive.

ERROR to the district court for Hamilton county. Tried below before SEDGWICK, J. *Reversed.*

*Hainer & Smith,* for plaintiff in error.

*C. J. Smyth, Attorney General,* and *Ed P. Smith, Deputy Attorney General,* for the state.

NORVAL, J.

Frank Maxfield was tried and convicted of the crime of rape, alleged to have been committed upon the person of a girl between sixteen and seventeen years old. His motion for a new trial was denied, and to reverse the judgment and sentence pronounced against him is the object of this proceeding.

Complaint is made of the sixth instruction, which reads as follows:

"6. You are instructed that a doubt, to justify an acquittal, must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case; and unless it is such that were the same kind of doubt interposed in the graver transactions of life it would cause a reasonable and prudent man to hesitate and pause, it is not sufficient to authorize a verdict of not guilty. If, upon consideration of all the evidence, you can say you have an abiding conviction of the truth of the charge, amounting to a moral certainty, you are satisfied beyond a reasonable doubt."

It is argued that the foregoing did not correctly define a reasonable doubt, but required the defendant to establish his innocence before he could claim an acquittal. An instruction in substantially the same language was approved by this court in *Polin v. State,* 14 Neb. 540, and *Willis v. State,* 43 Neb. 102. On the strength of those

decisions, the assignment of error relating to the giving of the instruction quoted is overruled.

The jury, after deliberating upon their verdict for some time, returned into court, when one of their number, in answer to an inquiry made by the presiding judge, stated, "What bothers us most is the competency of the prosecuting witness—what weight we should give conflicting and contradictory evidence—just that alone." Thereupon the court instructed the jury: "You yourselves are the sole judges of the weight of the testimony that has been introduced before you, and in determining what weight to give the testimony of the complaining witness in this case, you should take into consideration her appearance while upon the stand, her apparent interest or lack of interest in the proceeding, if any appear, and her manner of testifying, and, in the light of all her testimony and of the other evidence in the case, you should give to her testimony such weight, and only such weight, as you think under all the circumstances it is entitled to. And if upon consideration of all the evidence in the case and the former instructions of the court you find that all the material allegations of the complaint have been proved beyond a reasonable doubt, you should find the defendant guilty. If you find that the material allegations of the complaint have not been so proved, then you should find the defendant not guilty." It is not argued that the foregoing charge contained any erroneous statement of the law, or that it was not applicable to the case as made by the evidence, but the contention is that the instruction was not responsive to the inquiry made by the juror, and for that reason was misleading and prejudicial. This criticism is unavailing. The doctrine has been repeatedly stated that mere non-direction by the trial court is no cause for the reversal of a criminal cause where there has been no refusal of a proper instruction tendered. (*Hill v. State*, 42 Neb. 503; *Housh v. State*, 43 Neb. 163; *Pjarrou v. State*, 47 Neb. 294.)

Another ground urged for a reversal is that the verdict

is unsupported by the evidence.   The accused was mar-
ried, and on the date of the alleged occurrence resided
with his family in the village of Bromfield.   Sadie Stev-
enson, the prosecuting witness, resided with her parents
in said village.   The crime charged is alleged to have
been committed at the house of the defendant between
the hours of 1 and 3 P. M. on Sunday, January 31, 1897.
The prosecutrix alone gave testimony as to the particular
acts constituting the offense, the accused not having
taken the stand in his own behalf.   She testified that on
the date, and between the hours stated, she went to the
residence of the accused, and finding no person at the
house she started to leave, meeting him at the front gate;
that she inquired for his wife, and received as a reply that
the latter was out among the neighbors, but would soon
return home, and that upon invitation of the accused the
prosecutrix went into the house with him.   What trans-
pired while they were together must be gathered from
the testimony of Sadie Stevenson alone, and her state-
ments are conflicting and irreconcilable.   On direct ex-
amination she stated that after going into the house she
asked if he had a checker-board, which question elicited
an affirmative answer; that thereupon, at her sugges-
tion, they played a game of checkers, she being the win-
ner; that at the close of the game he threw her upon the
floor, unbuttoned her underclothes and removed them;
and, to use her language, "He treated me just like if I was
his own woman.   He took his parts out and put them in
mine," causing her to cry out and scream; that in about
half an hour, so she states, "He got me down again and
done the same thing over;" that then she put on her coat,
and, after accepting from the defendant fifty cents, one-
half for winning the game of checkers and the remainder
as hush money, returned to her father's house, thence to
a neighbor's, where she stayed until the next morning,
when she went to school, returning to her home in the
evening.   On cross-examination the prosecutrix, after
stating that it was in the defendant's house when she

first asked as to the time his wife would be at home, and that witness had no other conversation whatever with him, testified in answer to questions as follows:

Q. Now, the matter of having sexual relations was not discussed between you and him?

A. No, sir.

Q. Did he put his hands on you?

A. Yes, sir.

Q. What did he do when he put his hands on you?

A. He got me down.

Q. Where?

A. On the floor.

Q. Now, then, he fooled with you a while?

A. Yes, sir.

Q. And that is really all he did do, isn't it?

A. Yes, sir.

Q. That is all he did?

A. Yes, sir.

Q. Now, as a matter of fact he never consummated sexual relations with you—he simply took liberties with you with his hands?

A. Yes, sir.

Q. That is right?

A. Yes, sir.

Q. On the next Monday morning you saw his wife. didn't you?

A. Yes, sir.

Q. You were at school at that time?

A. Yes, sir.

Q. His wife came to the schoolhouse there and had a conversation with you?

A. Yes, sir.

Q. And she charged you with being too intimate with Frank?

A. Yes, sir.

Q. And you told her you hadn't been?

A. Yes, sir.

Q. You told her that?

A.  Yes, sir.

Q.  She tried to make you admit that he had done something wrong there at that time and you told her it wasn't so?

A.  Yes, sir.

Q.  And she threatened to arrest you?

A.  Yes, sir.

Q.  She went off and filed a complaint?

A.  Yes, sir.

Q.  After that you went home?

A.  Yes, sir.

Q.  By this time your father had found out about it?

A.  Yes, sir.

Q.  And he got very angry?

A.  Yes, sir.

Q.  And when he told you about it you told him that you hadn't done anything wrong, but he just fooled with you?

A.  Yes, sir.

Q.  And he took hold of you and threw you down and made you admit the whole thing?

A.  Yes, sir.

Q.  And he told you you would have to have this man arrested?

A.  Yes, sir.

Q.  And he insisted on you doing it, and you did do it?

A.  Yes, sir.

Q.  As a matter of fact this man never consummated sexual relations, but simply fooled with you on that Sunday, isn't it?

A.  Yes, sir.

On redirect examination Sadie Stevenson reiterated more than once the statement that the defendant did not have sexual intercourse with her, and that she so informed the defendant's wife, but subsequently, on being further re-examined by Mr. Day, the county attorney, she testified to having had illicit relations with the accused, and that she did not understand all the questions put to her on cross-examination.

8

Recross-examination:

Q. Before you went on the witness stand you have had a number of talks with Mr. Day?

A. Yes, sir.

Q. And he has been telling you about what he wanted you to swear in the case?

A. Yes, sir.

Q. And he told you that he wanted you to swear that he put his parts in yours?

A. Yes, sir.

Q. And that is the way he told you to state it?

A. Yes, sir.

Q. As a matter of fact, when I examined you with reference to Maxfield fooling with you, you understood just exactly what I was saying to you?

A. Yes, sir.

Q. You were then telling the thing as it was?

A. Yes, sir.

Q. And when you answered him you were telling the thing the way he told you to tell it in court?

A. Yes, sir.

\*       \*       \*       \*       \*       \*.       \*       \*

Q. You told your father when he first asked you about it that Maxfield hadn't done anything to you, didn't you?

A. Yes, sir.

Q. Then he took hold of you and threw you down and told you you had to testify to it, or tell it in court, or something like that?

A. Yes, sir.

No other witness called by the state in chief testified to any fact which tended in any degree to establish that a rape was committed upon the prosecutrix. That she visited Maxfield's house during the afternoon of the day in question and remained therein for a time is disclosed by the testimony of Mrs. William Tobey, a witness called and examined by the defense and who resided on the opposite side of the street, a short distance from defendant's home. Mrs. Tobey testified, in effect, that she saw

Sadie Stevenson and defendant go into the house to-gether about 2 o'clock in the afternoon, where Sadie re-mained about an hour; that witness was during all that time out in front of her own door making molasses candy, and observed a team drive in front of defendant's house and stop; that Maxfield thereupon came out of doors and remained about twenty minutes, and that witness heard no screaming or crying during the time Sadie Stevenson was in the house, although she was in hearing distance.   Dr. Case, a graduate of Rush Medical College, and a practicing physician for many years, testified that at the request of the county attorney he made an exami-nation of the person of the prosecuting witness three or four days after January 31, and found the hymen undis-turbed in its natural folds and all the parts in normal condition; that he had also examined the privates of the defendant, having treated him for disease of the bladder; and the witness gave it as his unqualified professional opinion that the prosecuting witness never had sexual intercourse with any man; and, furthermore, that it was impossible for her to have had incomplete coition with the defendant without producing certain contusions, the existence of which conditions his examination of her person failed to indicate or disclose.   On rebuttal, two physicians called by the state gave it as their opinion that it was possible for a man of mature years to have sexual intercourse with a girl sixteen years old without rupturing the hymen.

It is a well-established principle that in all criminal prosecutions by indictment or information the law sur-rounds the accused with the presumption of innocence, and he cannot be lawfully convicted unless the evidence adduced on the trial establishes his guilt beyond a rea-sonable doubt.   In the light of this rule can it be truth-fully asserted that this evidence was sufficient to justify the verdict?   We are all agreed that it is not.   The statements of Mrs. Tobey while upon the witness stand, if true, render quite improbable the truthfulness of por-

tions of the testimony of Sadie Stevenson, especially that the latter made any outcry; and no less important in that respect is the evidence of Dr. Case, who made a personal examination of the prosecutrix at the instance and request of the county attorney. If this conviction stands it must be upheld upon the unsupported testimony of Sadie Stevenson as to the principal fact, which is exceedingly unreliable, she having told so many conflicting and contradictory stories concerning the alleged occurrence. More than once she testified that the accused had sexual relations with her on January 31, 1898, and in almost the very next breath she stated he did no such thing, but merely "fooled with her with his hands." When the county attorney was conducting the examination of the prosecutrix her testimony was apparently of a criminating character, but when the questions were put to her by counsel for the accused the answers thereby elicited were entirely of an exculpatory nature. She likewise admitted having told others that the defendant sustained no improper relations with her. There is no corroborative testimony in the record as to the pivotal point in the case and in regard to which her testimony is conflicting. She is corroborated alone as to the fact that the two were together in the house,—that he had the opportunity to criminally assault her. This ordinarily would be sufficient corroboration where the principal fact is established by the testimony of the prosecutrix, and such testimony is clear and explicit and entirely consistent, and not contradictory; but where the testimony of the prosecuting witness bears upon its face evidence of its unreliability to sustain a conviction, there should be some corroboration by other evidence as to the principal fact relied upon to constitute the crime. In view of the contradictory and self-destructive character of the testimony of the prosecuting witness it cannot be said that the guilt of the commission of the crime of rape was established beyond a reasonable doubt. The testimony being

insufficient to sustain a conviction, the verdict and judg-
ment are set aside and the cause remanded for further
proceedings in the court below.

REVERSED AND REMANDED.