I am authorized to state that Boslaugh and Smith, JJ., join in this dissent.

STATE OF NEBRASKA, APPELLEE, v. ROY E. QUINN, APPELLANT.

141 N. W. 2d 422

Filed April 1, 1966. No. 36107.

John McArthur, for appellant.

Clarence A. H. Meyer, Attorney General, and Bernard L. Packett, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

CARTER, J.

Defendant was convicted of the crime of shooting with intent to kill, wound, or maim and sentenced to penal servitude for a term of 3 years. The defendant has appealed.

The evidence shows that about 4:30 p.m. on October 23, 1964, defendant went to the Highway Tavern and met Claude D. Lovelace. Twila Quincy came into the tavern shortly thereafter. The three of them engaged in drinking until about 10:30. They then went to the Arrow Inn where they continued their drinking. It appears that defendant had been keeping company with Twila for some time. They got into an argument and Twila left accompanied by Lovelace. They went to Twila's home.

Lovelace testified that Twila invited him into the house. He says they drank some coffee and smoked a cigarette. Twila then stated she was going to bed. She went into the bedroom and lay on the bed without undressing. Lovelace says that he went into the bedroom, sat on the edge of the bed and tried to talk to Twila, but she fell asleep. He says that he either fell asleep or passed out and fell to the floor. He says that he continued to sleep until he was awakened by defendant prodding him with the butt end of a rifle. He says that Twila was lying on the floor with a mangled foot.

He quotes the defendant as saying, "I have already shot her and I'm going to shoot you." Lovelace says he ran out the door followed by the defendant who fired two shots as he ran down the street. He ran about 10 blocks at which time he hailed a police cruiser car and came back with the policemen to Twila's home.

An ambulance was sitting in front of her home when Lovelace and the police arrived. Other members of the police force arrived shortly thereafter. The police found Twila lying on the floor with her clothes on and one foot practically shot off. A .348 caliber rifle was laying on the bed. There were large blood spots on the bed and on the floor. Two bullet holes were found in the bed. One bullet was found in the floor, another in a wall. Defendant was present. He told the police the shooting was an accident. Twila was removed to a hospital by ambulance and her foot was subsequently amputated.

Defendant testified to the same facts as Lovelace and Twila up to the time the latter two left the Arrow Inn. From that point on his testimony was substantially as follows: He did not see Twila and Lovelace leave the Arrow Inn. About midnight he went home and to bed. Thereafter he began to worry as to whether or not Twila got home safely. He called her home and no one answered. He called a second time and a man answered who in response to his question said Twila was not there. He thought the voice was that of Twila's former husband. He had previously been told by Twila that her former husband was very abusive and that he had beaten her up several times. He dressed, loaded his .348 caliber rifle, and drove to Twila's home. He admits that he shot a hole in the floor of his apartment while loading the gun.

On arriving at Twila's home, he tried to enter through the north door. Finding it locked, he shot the lock off and entered the kitchen. He says Twila came running into the kitchen and that he asked, "Where's Elmer?"

Twila told him he was not there and demanded the gun. He handed it to her. He looked around for Twila's former husband and discovered Lovelace lying on the floor. He thought he better get the cocked gun because it was dangerous and might go off. Twila pushed him aside and ran into the bedroom with the gun. He heard a shot. He ran into the dark bedroom and picked up the gun which was laying on the bed. Lovelace jumped up and ran out of the house. He says that he did not prod Lovelace with the gun and that Lovelace said nothing before running out of the house. He followed Lovelace out of the house and shot up in the air to "just help him along a little bit." He went back in the house and Twila said, "I'm shot." He asked where the light switch was and he says she got up and turned on the lights. He says he then attempted to let the hammer down on the gun, the hammer slipped, and the gun went off shooting the second hole in the bed. He then threw the gun over on the bed where it was found by the police. Defendant says that he thought the man who was in the room was Twila's ex-husband and that he knew no differently until the police told him at the police station.

Prior to the trial, Twila and defendant were married. She was called as a witness for the defendant. She testified that she did not know that Lovelace was in the house until he got up from the floor and ran out of the house. She says she was asleep and awoke when she heard the gun blast that blew the lock off the kitchen door. She ran into the kitchen, told defendant "Elmer" was not there, and demanded the gun. He gave her the gun. Defendant saw Lovelace on the floor and demanded the gun. Twila pushed defendant aside and ran into the bedroom with the gun and, to keep defendant from getting it, she "flipped" across the bed to lay it at the side of the bed and the gun went off. The shot awakened Lovelace and he ran out of the bedroom with the defendant behind him. There was no conversation between defendant and Lovelace. Defendant came back

into the bedroom and she got up off the bed and walked to the south wall and turned on the lights. She then heard a second shot. She says she was then leaning against defendant and when he moved she fell to the floor. Defendant called an ambulance and she was removed to the hospital after the arrival of the police.

A policewoman was called and testified that she interviewed Twila in the hospital the next day. She testified that Twila said she came home with Lovelace; and that she slept on the bed fully clothed. She first saw defendant in the doorway of her bedroom, she heard two shots, and she fell or was blasted out of bed by the first shot. Twila said she heard defendant tell the police it was an accident but that she knew it was not. She further said that after having her leg shot off she was in a state of shock and could not remember details. She further stated that she did not think defendant intended to kill her; that they had been drinking; that she knew Lovelace had stayed all night; and that defendant had shot the gun while in a fit of rage. She said that defendant stood in the doorway screaming and cursing; and that he shot her. Twila came back on the witness stand and denied that she had made the incriminating statements to the policewoman.

The evidence is sufficient to sustain the conviction. The evidence was in conflict on many of the essential facts, but the question of guilt under such circumstances is for the jury. It is a fundamental rule of law that the credibility of the witnesses and the weight to be given their testimony on conflicting evidence present a question of fact for the jury. In Texter v. State, 170 Neb. 426, 102 N. W. 2d 655, this court said: "As stated in Small v. State, *supra:* 'This court in a criminal action will not interfere with the verdict of guilty based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt.' " See, also, Sherrick v. State, 157 Neb. 623, 61 N. W. 2d

358; Salerno v. State, 162 Neb. 99, 75 N. W. 2d 362. The verdict is sustained by the evidence.

The defendant asserts that the trial court erred in not defining malice in the instructions. This issue was not raised in the motion for a new trial. No request for instructions was made. It is the contention of the defendant that since malice is an element of the crime, the trial court is required not only to set malice out as an element of the crime but to define it as well.

The applicable statute provides: "Whoever shall maliciously shoot, stab, cut or shoot at, any other person with intent to kill, wound or maim such person, shall be imprisoned in the Nebraska Penal and Correctional Complex not more than twenty years nor less than one year." § 28-410, R. R. S. 1943.

The trial court instructed the jury as to the elements of the crime as follows: "(1) That on or about the 24th day of October, 1964, in the County of Lancaster, State of Nebraska, the defendant, Roy E. Quinn, did then and there maliciously shoot Twila R. Quincy (2) With the intent to kill, wound, or maim said Twila R. Quincy." In a previous instruction the jury was told the following: "Under these pleas of 'Not Guilty,' the burden is upon the State to prove beyond a reasonable doubt each and every one of the elements necessary for a conviction on both Counts I and II and each of them." It is clear that the trial court submitted the issue of malice as an element of the crime charged to the jury.

The trial court gave the following definition of terms: "You are instructed that to do an act unlawfully, willfully, maliciously, and feloniously means to do it with the intent to violate the law and commit the act charged."

The defendant relies upon a definition in a homicide case which defines "malice" in its legal sense as follows: " 'Malice,' in its legal sense, denotes that condition of mind which is manifested by the intentionally doing of a wrongful act without just cause or excuse. It means any willful or corrupt intention of the mind." Housh

v. State, 43 Neb. 163, 61 N. W. 571. A correct and suitable definition of "malice," though many times attempted, has never been attained except by giving the term many different definitions. Carr v. State, 23 Neb. 749, 37 N. W. 630. In that case we said: "Approximately, it is that condition of the mind which shows a heart regardless of social duty, and fatally bent on mischief, the existence of which condition is inferred from acts done or words spoken." While the legal definition of malice could have been better stated in the instant case, the definition given is sufficient in the absence of a request for a more definite definition. The definition given in the instant case could not have misled the jury to the prejudice of the defendant.

We find the record to be free from prejudicial error and the judgment of the district court is affirmed.

AFFIRMED.