## FRANK STYSKAL V. STATE OF NEBRASKA.

### FILED OCTOBER 6, 1927. No. 25288.

*Norval Brothers* and *Thomas, Vail & Stoner,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before ROSE, GOOD, THOMPSON and EBERLY, JJ., LESLIE and SHEPHERD, District Judges.

ROSE, J.

This is a prosecution by the state in the district court for Seward county. Frank Styskal, defendant, was accused of shooting Joseph Styskal July 14, 1925. The information contained two counts, the first charging an intent to kill and the second an intent to wound. Defendant pleaded not guilty. The jury acquitted him of shooting with intent to kill, but found him guilty of intent to wound. For that offense he was sentenced to serve a term of one year in the penitentiary. Defendant, as plaintiff in error, presents for review the record of his conviction.

There are 57 assignments of error. One of them challenges an instruction on the intent presumable from the shooting and requires an examination of more than 300 pages of the record. This instruction was manifestly erroneous, but, in determining the question of prejudice to defendant, brief references to some of the evidential facts are necessary.

Defendant admitted the shooting. He used a shotgun at a distance estimated at 90 feet or more. About 79 birdshot struck the complaining witness on his left side and he was thus wounded. He was called "Joseph" by some of the witnesses. He walked from the scene of the shooting to his home and was promptly taken to a hospital, where he remained under the care of a physician for ten days or two weeks. The theory of defendant under his plea of not guilty was that he shot in defense of his wife and home. Defendant and Joseph were cousins. Both were married. Defendant was childless. Joseph had a large family. The two cousins were near neighbors in the village of Bee, Seward county. Their gardens were separated by a line fence. In 1918 and for more than two years thereafter they were partners in a general store at Bee. In it the wife of defendant had been a clerk. The partners sold out at the same time. Defendant gave as a reason for selling his share that his wife had been annoyed by amorous attention of his partner. The latter said he sold his interest in the store because defendant was dishonest. After a time Joseph reengaged in the mercantile business at Bee. According to the story of defendant's wife, Joseph repeatedly, for a year or more, in absence of her husband, attempted to have improper relations with her in and about her home, using at different times threats, personal violence, and other means. She testified that she reported these attempts to her husband. Joseph was in the home of defendant in the evening early in May, 1924. Both defendant and his wife were there at the time. Defendant wrote a check for wallpaper previously purchased from Joseph. The wife questioned the price charged and later hastened Joseph's departure from her home by firing two wild shots at him with a revolver. While testifying to this incident, Joseph himself was asked, referring to defendant: "Did he say or do anything at that time?" This was the answer: "No; he didn't. She hit at me and I pushed her hands down and she shot at me twice, and he took the revolver away from her." Joseph gave the reason for her shooting at him in

this form: "She thought I charged her too much for the paper." He explained further that the bill was $18.35, while she thought it should be $12. Her version of the shooting was that it was prompted by a false accusation on his part that she had formerly sustained criminal relations with him. There is evidence tending to prove that Joseph, in the presence of defendant's wife, had applied vile epithets to her husband, and that she had not herself escaped ignominy of a similar nature from the same source. During the unhappy relations existing between the two families, Joseph Styskal, the complaining witness, and his wife, Frank Styskal, defendant, and his wife, with their respective counsel, met at the office of the county attorney and entered into the following agreement:

"It is mutually agreed by and between the parties, Joe A. Styskal and Marie Styskal, husband and wife, and Frank J. Styskal and Victoria Styskal, husband and wife, that each of the parties will leave the other alone, stay away from each other's houses and places of business; that each will not talk about each other, each will keep their mouths closed and not threaten each other, not try to do each other any harm physically, and each will try to be, in the community, peaceful and will have no more trouble with each other, and further agree not to make any threats or hostile actions of any kind against each other.

"It is specially agreed that the parties hereto will live in peace in the village of Bee, and not associate with each other, and severely leave each other alone.

"Dated this 9th day of May, 1924.

> "Joe A. Styskal,
> "Frank J. Styskal,
> "Marie Styskal,
> "Victoria Styskal."

Details of what is implied by this instrument appear in the testimony. Each of the principals confessed to having a pistol and consented to surrender it to his attorney. Defendant testified that he had complied with the agreement.

Joseph said he had kept the agreement on his part, but he was compelled to admit that, contrary to its terms, he was in defendant's back yard when shot. He explained his presence there by saying he had been signaled by defendant's wife to approach and invited there by her to hear something about his own wife. It appears from her testimony that Joseph signaled to her and called her; that she told him she wanted nothing to do with him; that Joseph's wife was not then at home; that she thought defendant was absent; that she feared Joseph and went into her house. There is testimony to the effect that defendant, at the time, under circumstances implying his absence from home, had hid among growing corn in his garden and there fired the shot which inflicted the wounds charged in the information. There was also evidence that on a former occasion, at night, in absence of defendant, when his wife was alone, his house was entered clandestinely by Joseph who attempted to ravish her; that knowledge of this occurrence was communicated by her to her husband who, at an earlier date, as already stated, had taken a revolver from her while shooting at Joseph; that defendant had appealed in vain to his tormentor and to the law itself. The evidence of misconduct on the part of Joseph was contradicted by him and others who imputed to defendant shortcomings of the latter. In the situation thus far outlined the trial court gave the following instruction:

"Upon the question of intent, you are instructed that the law presumes a sane man to intend the reasonable, probable and natural consequences of any act by him intentionally and voluntarily done, and this presumption will always prevail, unless, from a consideration of all the evidence bearing upon this point, you entertain a reasonable doubt whether such intention did exist."

Both defendant and his tormentor testified to circumstances attending the shooting. Thereafter the law did not presume a criminal intent to take the place of evidence on that subject. After those present testified to the shooting and to the attending circumstances, presumptions of law as

to criminal intent were at an end. Contrary to the instruction, presumptions of law did not prevail for any purpose. A malicious intent was the controverted question for the jury to determine. The shooting itself was admittedly intentional. Evidence of the wounding was not disputed. Did defendant intend to protect his wife and home from an intruding defiler after the violation of a solemn contract and a vain appeal to the law? Did he shoot with a malicious intent to wound? These were questions for the jury to determine from the evidence without the aid of any presumption of law that defendant's intent was felonious. It was not within the province of the court or the jury to presume as a matter of law from the admitted fact of intentional shooting that the intent was malicious or felonious. Malicious intent was an element of the offense charged. Without malicious intent there was no felony. The burden of proving a criminal intent beyond a reasonable doubt by competent evidence was on the state throughout the trial. Presumptions of law did not take the place of such evidence or lessen or shift the burden of proof.

Should the reviewing court affirm the sentence on the ground that the error was not prejudicial? Defendant testified in his own behalf that he saw Joseph signaling to the former's wife and approaching, heard his insults and threats and his wife's protest that she wanted nothing to do with him, and that defendant shot in defense of his wife and home. He did not seem to understand English clearly and as a witness he expressed himself imperfectly at times. By able counsel he was cross-examined into saying in effect that he could, when present, protect his wife, but could not do so when absent, asking in answer to a question on cross-examination: "What do I have to take from this mean devil?" If a malicious and felonious intent should be inferred from his own confusing or inconsistent testimony, the question for determination was nevertheless for the jury without any erroneous instruction permitting them to presume malice as a matter of law from the admitted shooting, contrary to law and to defendant's theory of the de-

fense. The instruction under consideration was given in *Whitehead v. State*, 115 Neb. 143, and upon review the court said:

"For such an erroneous charge alone, when the circumstances of the tragedy were detailed by eye-witnesses, convictions have been reversed time and again. *Vollmer v. State*, 24 Neb. 838; *Botsch v. State*, 43 Neb. 501; *Whitner v. State*, 46 Neb. 144; *Kennison v. State*, 80 Neb. 688; *Davis v. State*, 90 Neb. 361; *Flege v. State*, 90 Neb. 390; *Franco v. State*, 98 Neb. 746; *Egbert v. State*, 112 Neb. 129."

Following these precedents, the conclusion is that the erroneous instruction was prejudicial to defendant. Consequently, the judgment is reversed and the cause remanded for further proceedings.

REVERSED.

SHEPHERD, District Judge, dissenting.

It seems clear to me from the record that the accused was not afraid of his cousin and knew that all he had to do in order to cause the latter to desist from advances to his wife and to leave his premises was to make his presence known. This is his own statement. But he chose to shoot from ambush at a range of 90 feet and to inflict a bloody and dangerous wound. His purpose was deliberate and premeditated, not only to stop his cousin in the instant attempt in his presence, but to fix him so that he could not repeat the attempt in his absence. As he put it and repeated it in his own testimony, "I wanted to fix him so he couldn't do it again." This being the case, it is trifling with plain words and making nothing of necessary implications to say that the defendant could have been without intent to wound.

Conceding that the instruction of the trial court was erroneous, it was not prejudicially so in view of the defendant's own testimony, and in my opinion the judgment should be affirmed.

Good, J., dissents on the ground that the instruction criticised was not prejudicial.