ALBERT QUIJAS V. STATE OF NEBRASKA.

275 N. W. 588

FILED OCTOBER 22, 1937. No. 30134.

*Morrow & Morrow,* for plaintiff in error.

*Richard C. Hunter, Attorney General,* and *Francis V. Robinson, contra.*

Heard before GOSS, C. J., ROSE, DAY, PAINE, CARTER and MESSMORE, JJ.

MESSMORE, J.

This is a proceeding in error from the district court for Scotts Bluff county, wherein the jury found the plaintiff in error (hereinafter called the defendant) guilty of murder in the first degree and recommended life imprisonment.

The offense occurred on the night of November 20, 1936, in Scottsbluff, Nebraska, and involves the Black Cat ballroom, which faces east on First avenue on a paved street, running north and south, one block east of Broadway. The dance hall is in the middle of the block. There is a doorway about the center of the hall. The space north of the hall is occupied by a filling station, located at Fifteenth street and First avenue on the west side of the street north of the dance hall.

The principal parties are the Guevara and Rojas families. The Rojas family included the mother, Lydia, and several sons, Gilberto, Rodrigo, Ted, Manuel and Fermin. The Guevara family consisted of Jose, Abundio, sons of Juana and her husband, Hilario, numbering five children, the mother and father. The defendant, Albert Quijas, also known as Gucho, is a nephew of Juana Guevara and a cousin of Jose and Abundio Guevara. Abundio Guevara, at some time prior to the transpiring of the events involved herein, separated from his wife, who was a daughter of Lydia Rojas. Gilberto Rojas had assaulted Jose Guevara, had been prosecuted therefor and convicted of assault, with intent to wound, at the same term of court in which this case was tried.

A detailed statement of the evidence in this case is neces-

sary in explanation of defendant's contention, as hereinafter set out.

Gilberto Rojas, a brother of Fermin Rojas, the deceased, testified that he was present at the Black Cat hall in Scottsbluff on Friday night, November 20, arriving at about 8:30; that he and Fermin Rojas went to the dance. The witness first saw the defendant standing south of the dance hall about 20 minutes before the trouble started. The witness and his brother, Fermin, were standing 15 to 20 feet north of the door, and the witness stood talking for about five minutes at the south edge of the curb north of the entrance; then defendant walked out, and when he was right south of the witness he said: "Gilberto, I want to talk to you." The witness said: "I will go with you, but I have nothing on me," and the defendant shot at the witness at that time. The witness' mother came from the dance hall, running towards defendant, and stood in front of the defendant, saying, "Don't shoot, don't shoot my sons." Defendant ran around a car parked in front of the witness. This car was parked in front of a lamp post located south of where witness was standing. When the defendant got around the car he shot twice again. The witness did not see or hear just how many shots were fired. Fermin was running north along the sidewalk, and when the witness first noticed him he was going towards the parked car, stooping down after two shots had been fired. The defendant was running fast, going over to Fermin who was walking fast. The other boys had left their mother behind and the defendant shot three or four times towards the filling station; then Fermin walked towards the car, leaned on the front fender of the car and fell dead. Defendant started running northeast. This witness was back of the lamp post at that time. On cross-examination the witness testified that Fermin got past the defendant; the defendant kept going back; Lydia Rojas followed him, and defendant was following Fermin.

Rodrigo Rojas testified that he first saw defendant at the dance while walking towards the musicians, and heard

the defendant ask Hilario for a gun; that Jose Guevara motioned and turned his back to the dancers, took a nickel-plated gun out of his belt and handed it to the defendant; that defendant went right out, as did Hilario and Jose and two other men. The witness heard defendant say in Spanish: "Let me kill one of them Rojas guys, I can get away with it; I have no family or anything, a single man." The witness went out to tell his brother and saw the defendant in the middle of the street and ran straight to the filling station to call the police. He heard a shot and ran over to Gilberto and Leo and took hold of Gilberto who was standing on the curb north of the entrance. Then witness saw his mother, Lydia, in front of the defendant, waving her hands and telling defendant not to shoot, and the defendant was trying to "duck around my mother and shoot at us." Fermin was walking toward the car north. Defendant fired three or four times when he was out in the street, and as Fermin was in front of the filling station. Fermin stooped down, and defendant started to run. On cross-examination, the witness testified that the first time he saw Fermin after he had taken hold of Gilberto, Fermin was north and the defendant farther east, about half way up to the pumps, and his mother was between Fermin and the defendant but farther south.

The witness Leonard Clark, a police officer, testified to finding three shells, and officer W. H. Nadler testified to finding one shell, in direct line with the first pump. The first empty shell was probably 20 feet from the body and out in the street about 10 feet from the sidewalk to the right of way, from the curb down to the pavement. The other two shells were probably another 10 feet but were about three feet apart. The body was immediately behind the car facing northeast, with the face up. Officer Nadler testified that automobiles on the west side of the street were parked parallel to the curb, and on the east side of the street edgeways. Charles I. Nycum, a police officer, was at the scene of the trouble a few minutes after midnight, with Captain Hedge of the police department. Nycum and

other officers testified that they found no broken glass nor a bottle from the front of the dance hall up as far as Fifteenth street.

Lydia Rojas testified that Fermin was 30 years old and married; that she saw the defendant with Jose Guevara and Hilario. She was sitting at the right side of the hall and had been there about a half hour, saw the two Guevaras and the defendant standing together, and saw defendant turn around with a gun in his hand; then put it in his pocket and go outside, followed by the two Guevaras. Fermin and Gilberto were not in the hall, only Rodrigo; she saw Rodrigo going out, and she ran out also; when she got to the outside of the hall she saw two of her sons there, and the defendant before them with a gun in his hand, telling Gilberto: "Come, Gilberto, I need you." To which Gilberto replied: "Yes; I will go with you but you must know that I have no weapon;" Gilberto took a step towards the defendant, who fired a shot; the witness approached defendant, put her arms out and said: "Please not to shoot, that my son was not armed." The defendant was right off the sidewalk, in the street, and had retreated a little towards the left of the dance hall. The witness testified that Fermin was walking along the sidewalk north when she first saw him; that the defendant was out in the street and ran towards Fermin to shoot and fired two shots when Fermin was approaching the parked car; that she followed the defendant north, standing in front of him and waving her arms, and the defendant kept following Fermin. The witness saw Fermin when he was approaching the car and then saw defendant run. When the first shot was fired by the defendant, he was about five steps from Gilberto and Rodrigo. On cross-examination the witness testified: Defendant kept going backward to get away from her and did not go far from her; he just kept going one way and another, but he did not go to the other side of the street.

When the body of Fermin Rojas was picked up, it was found that he was shot twice. One bullet entered the left

thigh approximately four inches below the hip, and the bullet which caused his death entered the left side about four inches below the shoulder, apparently going through the heart.

The witness Earl H. Plaster, attendant at the filling station, which was equipped with flood lights, the light extending the length of the pavement covering the "drive-in," was standing in front of the grease door on the south end of the building on the night of the shooting and saw the defendant coming from the street and back of the car, waving a revolver, and a woman pursuing him. The back end of the car was about even with the lamp post. The woman was waving her hands; they came around from behind the parked car and about even with the flat of the "drive-in." The witness heard a shot. Defendant seemed to be shooting in the direction in which the woman was following him, and apparently shooting around her. She was almost within arm's length and seemed to be chasing defendant up the street. Witness saw a man (later proved to be Fermin Rojas) running fast towards and "about to the pumps." The defendant backed up, with the woman still following him, and at about that time defendant was going behind the parked car. This happened when the shooting was going on. The defendant "pulled in about to the middle of the street," and the man who came in towards the pump (Fermin Rojas) "was running all of the time." He ran to the parked car, and as he approached the pumps he slowed down and then started towards the car. Two shots were fired in the direction in which Fermin Rojas was running. At that time the defendant and Fermin were about 30 feet apart. Fermin Rojas "carried himself from the car and turned a complete right turn and fell on his back behind the car." He was unarmed and apparently no one had attacked him. On cross-examination the witness testified that the woman followed the defendant all the way north to the corner, where he broke and ran, the woman still following him.

S. K. Warwick, a guard and state's witness, was asked

the following question: "I will ask you if at that time you asked him if he got the one he wanted, and if he said to you, in substance, 'I didn't care particularly which one I got,'" to which he answered, "Yes, sir." The witness Harry Heinicke testified to a conversation and interview he had with defendant at noon on November 21, and at that time the defendant stated: "There never was any trouble between me and the other boy," and "I don't know where the gun came from; it is not mine. I think some one slipped it into my hand."

The substance of defendant's testimony material to this case is as follows: He arrived at the Black Cat hall some time after 9:15 p. m. of November 20. As soon as he reached the door he saw Gilberto and Fermin Rojas standing south of the door; they called to him saying, "You don't want to fight my brother, Mike, you son-of-a-bitch, but we'll get you." Defendant then walked away from them about five steps and went north into the dance hall. He saw Jose Guevara coming from the west end of the dance hall and talked to him. Defendant testified: "I asked him if he had anything on him to protect myself, and he said, 'About what?' I told him the Rojases were after me, they are going to get me, and then he said, 'Well, the only thing I have got here is an automatic.' * * * He took it out and gave it to me and I put it in my coat pocket. * * * Then I was heading to go outside when I seen old man Guevara standing against the wall over by the door and I was figuring on asking him about my brother, but as soon as I got to him the Rojases came from the outside again and said, 'We will get you, you son-of-a-bitch,' and then I asked Mr. Guevara if he seen my brother. He said, 'No; you better go.'" Defendant testified that he then left the hall and as he got out on the sidewalk he felt something grab him; that he turned and it was Fermin, and with him Gilberto. Defendant said to them: "Don't follow me because I have got a gun in here," and they said: "Well, you have got a gun, use it, you son-of-a-bitch." Shortly thereafter Mrs. Rojas, mother of deceased, came out in front of

defendant and Rodrigo joined them. The mother was in front of the three boys, and defendant was backing north in the street; he took out his gun to show it to them and shot in the air two or three times. Mrs. Rojas was waving her hands and shouting: "Don't shoot; they are not armed." The defendant backed about 90 feet north, with Lydia Rojas and the Rojas boys following him. Defendant told them to stay back and leave him alone, and he testified that something hit him in the head and made him dizzy, and that he did not recall what happened from that time on. The alleged insult to defendant by the Rojas boys was testified to only by defendant himself.

Defendant's testimony is substantiated by Mrs. Guevara, who testified, in addition, that when she got outside the Rojases had surrounded defendant; that defendant ran and they followed him; that she saw Fermin throw a bottle at defendant; that it hit him on the head, and that several shots were fired after that time. The testimony of Hilario Guevara substantiates the story told by defendant as to the witness' conversation with defendant, as related in his testimony, and that the Rojases followed defendant. This witness further testified that he was near the door of the Black Cat hall, and that when the defendant came into the hall the Rojases followed him, saying "they were going to get us and they sweared at us;" that the Rojases followed defendant out of the hall. The witness heard the first shot; did not hear defendant say he would kill one of the Rojases. Jose Guevara testified substantially as to the conversations that he had with the defendant about the gun; that he saw the mother and the Rojas boys follow the defendant out; that the defendant was in the middle of the street, to the east and north of the entrance to the dance hall; that Mrs. Rojas was "rushing Albert" and the "Rojas boys were behind their mother." The witness saw Fermin pick up a bottle and hit defendant in the head, and that was when defendant fired. He testified that defendant was telling Mrs. Rojas "not to get close to him or he will shoot;" that Mrs. Rojas "kept trailing Albert"

north to about the corner of the dance hall, and that defendant started running north. There is other testimony in the record as to the condition of the defendant in the hospital when he had a conversation with the news reporter, and evidence of his being beaten with a revolver by the Rojas boys immediately after the killing. All of the facts and circumstances relative to the shooting were testified to by eyewitnesses.

There is some evidence given by defendant as to certain statements made to him by the Rojas boys, who called him vile names. The Rojas and Guevara families had had considerable trouble just prior to the time of the killing. There is some evidence that defendant walked backward and the mother of the boys followed him to the corner; that the distance he was backing up, followed by Mrs. Rojas, was approximately 90 feet; that at that point defendant broke and ran. There is further evidence that Fermin Rojas was running north along the sidewalk, and that he cut over towards the parked automobile, going towards the defendant. There is also evidence that just before the trouble started the defendant was surrounded by the Rojas boys and their mother, and evidence that immediately after defendant had fired the two shots at Fermin and broke and ran, two of the Rojas boys ran after him and beat him.

Defendant contends that the trial court erred in giving instruction No. 9, as follows: "In case of homicide, the law presumes malice from the unlawful use of a deadly weapon upon a vital part, and when the fact of unlawful killing or shooting causing death is proved, and no evidence tends to show express malice on the one hand, or any justification, mitigation or excuse on the other, the law implies malice, and the offense is then murder in the second degree. You are instructed that in law a loaded gun is a deadly weapon, and if you believe from the evidence, beyond a reasonable doubt, that the defendant, Albert Quijas, wantonly and cruelly, and without justification or excuse, shot and caused the death of Fermin Rojas with a deadly weapon, then the

law presumes such shooting was done maliciously, unless you believe from the evidence it was done without malice."

In support of his contention, defendant cites *Vollmer v. State,* 24 Neb. 838, 40 N. W. 420; *Lucas v. State,* 78 Neb. 454, 111 N. W. 145; *Kennison v. State,* 80 Neb. 688, 115 N. W. 289; *Davis v. State,* 90 Neb. 361, 133 N. W. 406; *Egbert v. State,* 112 Neb. 129, 198 N. W. 1014; and *Styskal v. State,* 116 Neb. 8, 215 N. W. 465, to the effect that, where the circumstances attendant upon a homicide are fully testified to by eyewitnesses, it is error to instruct the jury that there is a presumption of malice from the fact of the killing by the use of a deadly weapon. The state virtually concedes that instruction No. 9, given by the court, is erroneous, but argues in this court that it is not prejudicially erroneous; that, in fact, there is nothing to be presumed; that the facts which the jury believed constitute murder in the first degree; that the cases cited by counsel for defendant are for the most part cases of second degree murder, and that such instruction only goes to second degree murder.

In the opinion in *Lucas v. State, supra,* it is said (p. 457) : "If, then, the law does not presume malice from the fact of the killing when all the circumstances connected with the transaction are testified to by eyewitnesses, this instruction was wrong. If the jury are to determine the grade of the offense depending upon the question of malice from the evidence of the witnesses who saw the transaction, uninfluenced by any presumptions against the defendant, then the instruction cannot be sustained."

In *Egbert v. State, supra,* in the body of the opinion we find this language (p. 131) : "Under the law of Nebraska malice is an element of murder in the first degree and also in the second degree."

In *Kennison v. State, supra,* it is said (p. 691) that the "burden of proof in a criminal case does not shift, but remains with the state until the end of the trial, and that it is incumbent upon the state to prove beyond a reasonable doubt that the defendant's act was actuated by malice at

the time the fatal shot was fired." This being true, the defendant herein was deprived of a fundamental right guaranteed to him by law, and the presentation of his defense of self-defense, given by the court, would be practically barred. For a reviewing court to analyze the evidence to determine the degree of guilt, if any, of the defendant would be tantamount to deciding in a proceeding in error an issue of fact within the exclusive province of the jury.

We therefore conclude that the judgment of the district court should be and is reversed, and the cause remanded for further proceedings.

REVERSED.