NICK VALLAS V. STATE OF NEBRASKA.

288 N. W. 818

FILED DECEMBER 8, 1939. No. 30727.

*William Morrow,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Clarence S. Beck, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

MESSMORE, J.

Plaintiff in error (hereinafter referred to as defendant) was charged in an information with shooting with intent to wound, and on the second count with shooting with intent to kill. The jury returned a verdict of guilty of shooting with intent to kill. Motion for a new trial was overruled, and the defendant sentenced. He brings error to this court for review.

The record discloses the following pertinent facts, in substance: Defendant, on February 23, 1939, the date of the offense charged, loaned his automobile to Elsie Adams, as he had done on other occasions. She was to drive to the home of her brother, Edward Curtis, and he was to drive the car for her as directed by the defendant. Before she left, defendant removed a gun from a compartment in the car and placed the gun in his pocket. She met Tony Guzman about 10 o'clock in the morning and they agreed to meet at 6 o'clock in the evening at the Eagle Café in Scottsbluff. Elsie Adams, her brother, his wife, and Tony Guzman went to a show, leaving the theater shortly after 11 p. m. Guzman drove the car and delivered Curtis and his wife at their home, and she and Tony proceeded to his place of residence about three miles east of Scottsbluff. There is evidence that they took an indirect route.

The defendant went to the Curtis home, asked Edward where the car was, and was told that Elsie had just left with it. Curtis then went to Elsie's home in Gering, to watch over the children and to bring back the car. Elsie's husband, Noah Adams, then appeared at Elsie's home, accompanied by John Vohland, and there was some conversation among them about Elsie. Finally, it was decided that Noah Adams, Curtis and the defendant would go with Vohland in his car in search of Elsie. They located Elsie and Tony near his residence and sought to stop him. Guzman put the car in reverse, backed up quickly into a farm

driveway and turned around, proceeding at a high rate of speed to Scottsbluff, followed by Vohland and the others. Finally, Guzman was stopped on Broadway in the city.

Guzman stated that out on the highway, before arriving at Scottsbluff, defendant got out of the car, and he could see that defendant had a gun, and defendant "hollered for us to stop." Vohland stated he did not see defendant with a gun at that time. According to Guzman's testimony, when the car stopped in Scottsbluff defendant got out of the car and ran towards Guzman, appeared to be angry and called Guzman vile names, pointed the gun at him and fired. Guzman dodged and stated he could hear "the buzz of the bullet." The defendant was about 20 feet distant from Guzman at the time, and they were proceeding towards each other. Guzman said that defendant was going to hit him; "I grabbed his hand and pulled it up in the air and the next shot went up in the air." Guzman then pushed defendant, who fell down, and Guzman tried to obtain the gun. There was a scuffle, both trying to gain possession of the gun, the defendant calling for help. Vohland, so Guzman stated, struck him on the head, threatened him and called him a vile name. Guzman stated that defendant hit him on the head with his gun after he had fired the second shot. Curtis stated that he saw the defendant with a gun in his hand and saw him fire; that the gun was pointed at Guzman's head and that two shots were fired; he did not testify as to how the second shot was fired. The gun was .38-caliber, containing one load in the barrel and five in the magazine. One shell was found on the pavement by a police officer.

Vohland testified that at the time he got out of the car, and as he was going around it, he heard another shot; that Guzman was standing right in front of the door on the running-board of defendant's car, which he, Guzman, was driving; "he had clenched onto Nick (defendant) and they were scrapping standing up;" that Guzman jumped onto the defendant, "knocked him down and got on top of him and he was beating him, and the gun was on the cement and

they were scuffling around there trying to get the gun;" that the defendant was "yelling for help, * * * and as I got over there I shoved Tony Guzman right off of him—shoved him quite a ways onto the sidewalk;" he did not strike him but pushed him six or seven feet. Witness stated that defendant "staggered around there and he was getting up;" that Guzman "kind-a turned around and acted like he was going to come at me so I started after him again there and he started up the sidewalk and I followed him."

Defendant testified that when he got close to the car Guzman got off the running-board and jumped on him; that he did not pull a gun on or shoot at Guzman; that when he fell down the gun fell out of his pocket; that both he and Guzman tried to grab it; he, defendant, called for help. The evidence is not clear that two shots were fired, or the manner in which the second shot was fired, if at all. After the scuffling, Guzman proceeded towards the Eagle Café; the defendant got into his car and drove to Elsie Adams' home. Finding no one there, he then drove to Scottsbluff, where he had a business engagement, and was arrested en route. Elsie Adams did not testify at the trial, she being at her mother's home in Kansas at the time. There is evidence that the defendant took her to Kansas at her request.

The defendant complains of that part of instruction No. 6 reading: "The law warrants the presumption, or inference, that a person intends the results or consequences to follow an act which he intentionally commits, which ordinarily do follow such acts." The defendant likewise contends that the court erred in giving instruction No. 10, as follows: "To constitute the offense charged in this case the intent alleged in the information is necessary to be shown, but direct and positive testimony is not necessary to prove the intent. It may be inferred from the facts and circumstances shown by the evidence." The following part of the instruction is criticized: "And if you believe from the evidence, beyond a reasonable doubt, that the shooting, as alleged in the information, was done wilfully and inten-

tionally and was likely to be attended with dangerous consequences, the intent to kill or wound requisite to make out this case as charged may be inferred therefrom."

The authorities are agreed on the general proposition that, in a prosecution for assault with intent to kill, the specific intent to take life is the gist of the offense. The intent must be proved as charged. The jury should be instructed that before they can return a verdict of guilty they must be convinced from the evidence that the accused entertained a design to kill. 13 R. C. L. 799, sec. 103, cases cited under note 7.

The cases of *Curry v. State,* 4 Neb. 545, *Krchnavy v. State,* 43 Neb. 337, 61 N. W. 628, *Botsch v. State,* 43 Neb. 501, 61 N. W. 730, and *Ward v. State,* 58 Neb. 719, 79 N. W. 725, are cited in support of defendant's contention that the foregoing instructions, or parts thereof, given by the court, constitute error. The state analyzes the cases on the presumption of intent, citing in addition *Bruno v. State,* 111 Neb. 715, 197 N. W. 612, and *Styskal v. State,* 116 Neb. 8, 215 N. W. 465.

In the latter case the defendant waited in ambush to shoot a man who was paying unwanted attention to his wife. He did shoot him and wounded him. He shot him intentionally and such fact was admitted. The question for the jury to determine was the malicious intent, and whether or not the theory of the defense, that the defendant shot in defense of his wife and home, was supported by the evidence. The following instruction was given relative to the presumption of intent: "Upon the question of intent, you are instructed that the law presumes a sane man to intend the reasonable, probable and natural consequences of any act by him intentionally and voluntarily done, and this presumption will always prevail, unless, from a consideration of all the evidence bearing upon this point, you entertain a reasonable doubt whether such intention did exist." The giving of this instruction, that the defendant is presumed to have intended the reasonable, probable and natural consequences of his voluntary act, was held to be error under

the circumstances of the case. The court stated in the body of the opinion: "The burden of proving a criminal intent beyond a reasonable doubt by competent evidence was on the state throughout the trial. Presumptions of law did not take the place of such evidence or lessen or shift the burden of proof." The court further stated: "When the circumstances of the tragedy were detailed by eyewitnesses, convictions have been reversed time and again," citing numerous cases.

Most of the cases cited deal with instructions on the presumption of malice in homicide cases, the court declaring that an instruction which presumes malice, where the witnesses to the transaction are eyewitnesses, is erroneous, where malice is one of the principal ingredients of the offense charged; and among the cases cited is *Styskal v. State, supra,* a prosecution for shooting with intent to kill. So, apparently, the same principle of law applies in a case involving shooting with intent to kill or wound, where the witnesses to the shooting and attendant circumstances are eyewitnesses.

In the instant case, the shooting was denied; in *Styskal v. State, supra,* the shooting was admitted. However, in the instant case, as in the *Styskal* case, the shooting and attendant circumstances thereof were detailed by eyewitnesses. The only other witnesses were police officers, testifying to collateral facts. This case is distinguished from those cited by counsel for both defendant and the state on the instructions given, and in the case at bar the instruction is erroneous in any event for the reasons stated in *Styskal v. State, supra.* The rule in such case is:

Where the defendant is charged with assault with intent to kill or wound, and the details of the shooting and the attendant circumstances in reference thereto are testified to by eyewitnesses, instructions with reference to the presumption of law on intent should not be given, and, if given, constitute prejudicial error. The presumption of law does not take the place of such evidence or lessen or shift the burden of proof. In cases of this kind, intent is one of the

principal elements of the offense charged, and instructions on the burden of proof in this respect are proper; likewise, instructions, informing the jury as to matters to be taken into consideration in determining the intent, as found in *Botsch v. State, supra,* would be proper, but instructions that overstate or overemphasize the intent, as heretofore explained, in view of the testimony of eyewitnesses to the shooting and to the attendant circumstances, are erroneous and prejudicial as a matter of law.

In addition, instruction No. 10, as given by the trial court and heretofore quoted, is erroneous in that it uses the language "was likely to be attended with dangerous consequences." In the light of the record in the instant case, it stands to reason that the shooting would not be "attended with dangerous consequences." No discharge of a bullet from defendant's gun struck Guzman. The court anticipated that which could not happen under the circumstances of the case, and such instruction is prejudicial to the substantial rights of the defendant.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.