## FRANK WARD V. STATE OF NEBRASKA.

### FILED JUNE 21, 1899.   No. 10744.

1. **Jurors: Challenges: Evidence.** A challenge of a juror for cause raises a question which is to be decided by the trial judge from a consideration of all the facts developed during his examination, and any circumstances which tend to enlighten upon the matter; and of these are the appearance and actions of the juror while undergoing the examination.

2. ———: **Qualification: Opinions.** An opinion or impression of a juror formed from reading newspaper reports and hearing general rumors, of none of which he has a settled belief, but expresses rather disbelief or disregard, is hypothetical and does

not disqualify him if he also states that he can render a fair and impartial verdict based solely upon the evidence and wholly without the interference of such opinion or impression.

3. ———: ———: REVIEW. The determination of the trial judge in the decision of a challenge of a juror for cause will be sustained on review if not clearly wrong.

4. **Assault with Intent to Murder:** PROOF OF INTENT. A charge of an assault with intent to murder is of a crime of which the intent is an essential element, and its proof as indispensable as the proof of the act which it accompanies.

5. ———: ———. Where there is no bodily injury or result from the act or assault, the intent may not be presumed from the act; but as the intent is a process of the mind, and necessarily hidden or secret, it may not be susceptible of proof by independent evidence. It may be gathered or drawn from all the evidence, facts, and circumstances of the case, inclusive of the act, and is a matter of fact for the consideration and decision of the jury.

6. **Criminal Law:** SUFFICIENCY OF EVIDENCE. If a finding of a jury is attacked as not sustained by sufficient evidence, it will not be disturbed by the appellate court unless manifestly wrong.

ERROR to the district court for Jefferson county. Tried below before LETTON, J. *Affirmed.*

*W. P. Freeman* and *Heasty & Clapp*, for plaintiff in error:

One of the jurors stated on the *voir dire* that he had an opinion as to the guilt or innocence of accused, based on newspaper reports and on conversations, and that it would require evidence to change the opinion. The juror should have been excused upon accused's challenge for cause. (*Curry v. State*, 4 Neb. 548; *Miller v. State*, 29 Neb. 438; *Bayse v. State*, 45 Neb. 261; *Cowan v. State*, 22 Neb. 519; *Olive v. State*, 11 Neb. 11.)

In support of an argument in favor of the contention that there was not sufficient proof of the intent charged to sustain the conviction reference was made to the following cases: *Hairstone v. State*, 54 Miss. 689; *Crisman v. State*, 54 Ark. 283; *Curry v. State*, 4 Neb. 545; *Patterson v. State*, 85 Ga. 131; *Botsch v. State*, 43 Neb. 501; *Lacefield v. State*, 34 Ark. 275; *Smith v. State*, 52 Ga. 88.

*C. J. Smyth, Attorney General,* and *C. H. Denney, County Attorney,* for the state.

HARRISON, C. J.

An information was filed in the district court of Jefferson county in which the plaintiff in error was charged with an assault upon one Gregg Long with a deadly weapon, "a large knife, sometimes called a dirk knife," with the intent to kill and murder him. To this the plaintiff in error pleaded not guilty, and a trial resulted in his conviction and sentence to a term of imprisonment in the penitentiary. In an error proceeding in his behalf to this court two questions are presented, one that the trial court erred in overruling a challenge for cause of one of the jurors, and another that the evidence was insufficient to sustain the verdict, especially of the intent elemental of the crime charged. In regard to causes for challenge to jurors it is stated in section 468 of the Criminal Code: "The following shall be good causes for challenge to any person called as a juror on the trial of any indictment: * * * That he has formed or expressed an opinion as to the guilt or innocence of the accused; *Provided,* That if a juror shall state that he has formed, or expressed, an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror as to the ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments, or reports, or upon rumor, or hearsay, and not upon conversations with the witnesses of the transactions, or reading reports of their testimony, or hearing them testify, and the juror shall say, on oath, that he feels able notwithstanding such opinion to render an impartial verdict upon the law and the evidence, the court, if satisfied that said juror is impartial, and will render such verdict, may, in its discretion, admit such juror as competent to serve in such case." We do not deem it necessary to quote the

50

statements of the juror who was challenged.  His examination disclosed that if he had an impression or opinion relative to the subject of the trial, it was formed from newspaper reports which he had read or from rumors which he had heard repeated or discussed, and of the truth of either the newspaper reports or rumors he had no fixed belief, rather disbelieved or discredited them.  If the juror had an opinion it was not unconditional or fixed, but conditional and hypothetical, and, within the doctrine of the decision in the case of *Basye v. State*, 45 Neb. 261, it was not error to overrule the challenge for cause.  (See, also, *Murphy v. State*, 15 Neb. 383; *Curry v. State*, 5 Neb. 412.)

It is urged in this connection that the constitution and our laws demand that care be taken that the defendant in a criminal action be given a fair trial.  The record herein discloses, we think, a well-sustained careful effort to afford the party charged an impartial hearing, a trial fairly conducted.  To a comprehension of the question of intent elemental of the charge against the accused a careful examination of the evidence which bears upon the subject is necessary.  The record discloses that Henry Ward, the father of the prisoner, was the owner of a farm on which the latter had resided for some time prior to the occurrences in which this prosecution had its origin, and further, that the latter had cultivated a portion of the farm and had planted and had grown thereon a crop of corn of which he testified he was entitled to a share.  This was done during the crop season of 1898, prior to the time of the act which caused his arrest.  In the fall of 1898 the farm was leased to Gregg Long for the year 1899, to be worked by him and one Frank Picha, Long's brother-in-law.  They occupied the farm on or about December 1, 1898, and at some date during that month Henry Ward, who it seems was living with the renter, went to Kentucky and Illinois with the intention of being absent for a considerable and indefinite time.  It was of the evidence that he in-

structed the renter that if his son came to the farm after certain specifically designated property, he was to be allowed to take it, but corn was not named. On this point there was a conflict in the evidence. There was some testimony to the effect that the directions to the renter were inclusive of corn. It also appeared that Henry Ward sold to Frank Picha a team of horses of which his son asserted ownership. On February 2, 1899, the accused, with a team and wagon, went to the farm and drove to a crib in which there was some "snapped corn," a portion of which he claimed, and took therefrom a wagon load of the corn. Gregg Long testified that he then had a conversation with the plaintiff in error. The testimony of Long on this point is as follows: "I told him that we had no right to let this corn go; that it was in my care. He said, 'It don't make no difference,' he was going to have it. I told him this corn was in my care, and I could not let it go. Mr. Ward holds me responsible for it; and he says, 'No, he wouldn't.' I told him I didn't want to let it go. He took that load, and when he took that load along I told him not to come back and bother me any more. He said he was going to get that corn, and corn was in the ear in the crib right aside of it, and he said after that he was going to get the shelled corn. I told him, 'No.' I told him I wanted him to stay off the place. He said, 'No,' and I warned him to stay off the place and not bother us any more." Two days later, or on February 4, 1899, the accused returned to the farm and proceeded with the team and wagon near to the crib and with the intention to get another load of corn therefrom. The wagon had on "the top box" or the "double" box. He was seen by Long and Picha, who then approached him and stopped near the wagon, Long about the hindmost portion of the rim of one front wheel of the wagon as it stood, and Picha nearer the front end of the wagon, but close to Long. The plaintiff in error was standing in the wagon bed or box near the center, probably a trifle toward the front. Gregg Long testified

of what then occurred as follows: "And I told him we didn't have no right to let no more of that corn go, and he said he was going to get it; it didn't make any difference, he was going to get that corn. After that he changed his subject, and he says, 'Those cobs there, I am going to take them, too.' I told him, 'No.' He said, 'They are worth $10'—he was going to take them and sell them. I told him, 'No,' the fuel was all to be mine for boarding the old gentleman; and he said, 'No,' he was going to sell them. And from that he changed his subject,—he said a little more before that, but I can't remember what it was,—from that he changed his subject, and he says, 'This black team there is yours, too.' (It belongs to my brother-in-law.) He says, 'Yes,' he says, 'I am going to take that, too,' and we said 'No.' He says, 'I am going to take them,' he says, 'I am going to take them right along,' and we both spoke up at the same time that the team belonged to us and you ain't going to take them. He jumped up and said, 'God damn you fellows, if you want to fight, I will fix you here.' He had a dirk knife in his hand."

Q. What did he do?

A. He jumped up from the wagon, and with his knife right this way (indicating) in his right hand, and made a lunge to stab me, and as he jumped I jumped right out from under him,—I stepped off a few steps pretty lively and looked over my shoulder. As he struck the ground he made a bow in that shape, and started after me. I broke and run. He was coming right after me. I had a gun by me. After I had run about ten steps, I pulled the gun; I couldn't do it any sooner, I had big rough mittens on; just as soon as I could I got them off, I pulled the gun and I turned around and I says, "Stop," and he stopped.

Also, that nothing further was said; that Ward got into his wagon and drove away.

Frank Picha stated:

He was going to take the team right along with him

that day, and we told him he wouldn't. He said he would. And then he got mad over it and jerked his overcoat off and jerked a knife out of his pocket and jumped out of the wagon and started after us.

Q. What did he say when he started to jump off of the wagon?

A. He said, "God damn you fellows, I will fix you right here," and he had the knife in his hand and as he jumped off he made a strike at us.

Q. At who?

A. At Mr. Long.

Q. Where did he light when he jumped off of the wagon with reference to where Gregg Long was standing at the time he started to jump?

A. Well, he jumped nearly in the same place where Mr. Long was standing.

Q. Now, when you started to run, what did he do?

A. Who, Gregg Long?

Q. No, you and Gregg Long started to run away?

A. Well, he followed us.

Q. Frank Ward followed you?

A. Yes, sir.

Q. How did he hold his knife then, when he was following you?

A. I think he held it this way (indicating); I know he did.

Q. What happened next?

A. Well, then as soon as Mr. Long got his mittens off and pulled the revolver out, why he stopped Frank.

Q. What did he say?

A. He told him to stop, and Frank turned around and jumped into his wagon and off he went.

Q. Did you see Frank's face at the time he was running?

A. Running toward us?

Q. Did you see Frank Ward's face at that time when he was running?

A. At us?

Q. Yes.

A. Yes, sir.

Q. How did he look?

A. He looked mad.

Q. Had there been anything said about fighting previous to the time that Frank said "I will fix you"?

A. No, sir.

Two boys, William and Thomas Larder, who were present throwing corn from a wagon into a crib near where the other parties were and heard and saw much or all of what was said and done, testified to the same effect and without material differences relative to the main facts as did Long and Picha. One of them said the accused struck at Long with the knife as he jumped from the wagon, the other stated that he did not see Ward strike at Long at the time of the jump from the wagon. The witnesses for the state described the knife used as a "dirk," with a pointed blade, sharp on both edges, and the blade about six or eight inches long. The accused testified that the blade of the knife was ten or twelve inches long. He stated in his testimony that the two parties threatened him, and on cross-examination said that the threat was to prosecute him if he took the corn. In relation to his intent the accused was asked, "What did you intend to do when you jumped out of the wagon?" and answered, "I thought I would scare them away." It will have been noticed that whatever the intention of the accused was, as a matter of fact it ended in an attempt; he inflicted no wound or bodily injury on the other party. This result was very probably more by force of circumstances and preventive conditions than from lack of purpose on his part, or such was the apparent conclusion of the trial jury.

It is argued that the words used by the accused just before or at the time he jumped from the wagon, "If you want to fight, I will fix you here," were conditional and show that he did not have an absolute intent in his mind to "fix" them or one of them. There had been no talk of

fighting or of personal violence, and whatever may have been in the mind of the plaintiff in error at the time he used the sentence we have quoted, it is clear that he did not care whether the other parties wanted to fight or not; he, as soon as he had prepared for action by getting his weapon from his overcoat pocket, immediately proceeded to carry out any intent he may have had, regardless of any conditions. The words employed cannot under the circumstances be given the force claimed for them, that of disclosing a conditional frame of mind or intent. The elements of the crime of murder were all present and active if there had been a killing, if the death of the party assaulted had resulted; but there was no killing, there was not even bodily hurt or injury, and the charge is of a crime of which the specific intent was an essential element, and its proof as indispensable as proof of the act (*Botsch v. State*, 43 Neb. 501); and in this case the intent cannot be presumed from the act. "A person is presumed to intend to do that which he voluntarily and willfully does in fact do.   *   *   *   But if the intent is to be carried beyond the result actually produced by the acts of the accused, it will be necessary to introduce evidence which would justify the jury in so finding." (*Curry v. State*, 4 Neb. 545.) But where there is, as in the case at bar, no result of the act, the intent of the act is to be gathered and measured by all the acts, facts, and circumstances of the occurrences upon which the charge is predicated, as was observed in *Botsch v. State*, 43 Neb. 503. "The intent is a mental process, and as such generally remains hidden within the mind wherein it was conceived, and is rarely, if ever, susceptible of proof by direct evidence, but must be inferred or gathered from the outward manifestations shown by the words or acts of the party entertaining it, and the facts or circumstances surrounding or attendant upon the commission of the assault with which it is charged to be connected." While a presumption may not arise from the act, an inference may. In the opinion in the case of *Krchnavy v. State*, 43 Neb. 337,

in which a reversal of a conviction and sentence on a charge of assault with intent to murder was sought, after quoting the rule announced in *Curry v. State, supra*, it was stated: "We do not, however, interpret the rule to require in every case independent evidence of the particular intention. On the contrary, the circumstances attending the principal act may be of such a character as alone to exclude every rational hypothesis except the existence of the specific intent charged. According to the modern and more reasonable view the test in all such cases is a rule of logic rather than a rule of law; and while a direction to the effect that men are presumed to intend the natural and probable consequences of their voluntary acts is generally held unobjectionable, what is meant thereby is that the jury are at liberty, if the circumstances warrant, to infer the intent from the act. Such inference, in the language of Dr. Wharton, is not one of law, but of probable reasoning, as to which the court may lay down logical tests for the guidances of the jury, but can impose no positive binding rule. (Wharton, Criminal Evidence secs. 735, 736.)" The question of the intent was one of fact for the jury to determine from all the facts and circumstances, the act and all the attendant facts. Although after the review of all the evidence as presented in the record we, as judges, might say that we have a doubt of its sufficiency on the subject of intent, we cannot say that the determination of the jury was manifestly wrong; hence we cannot disturb it. (*Monroe v. State*, 10 Neb. 448; *Whitman v. State*, 42 Neb. 841.) It follows that the judgment of the district court must be

AFFIRMED.