STATE OF NEBRASKA, APPELLEE, V.
GEARY DANDRIDGE, APPELLANT.

312 N.W.2d 286

Filed November 6, 1981. No. 44022.

Dennis R. Keefe, Lancaster County Public Defender, and Gerald L. Soucie for appellant.

Paul L. Douglas, Attorney General, and Sharon M. Lindgren for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BOSLAUGH, J.

After trial to a jury the defendant was convicted of robbery, use of a firearm in the commission of a felony, and being an habitual criminal. He was sentenced to consecutive terms of imprisonment for 10 years on each count.

The defendant has appealed and has assigned as error (1) failure to admit evidence of other similar crimes committed while the defendant was incarcerated as proof that defendant was not guilty of the robbery charged, (2) failure to declare a mistrial when the State violated a pretrial order, (3) misconduct of the county attorney in failing to disclose statements made by the defendant's accomplice, (4) prosecutorial misconduct in failing to disclose the true nature of the plea bargain with a prosecuting witness who was granted immunity, (5) prosecutorial misconduct in failing to disclose exculpatory evidence, (6) prosecutorial misconduct in vouching for the credibility of a witness for the State, (7) prosecutorial misconduct in using the testimony of a witness who had failed a polygraph examination, and (8) the imposition of consecutive habitual criminal sentences where both crimes arose out of one transaction.

The robbery took place at the Burger King Restaurant in Lincoln, Nebraska, on September 17, 1979. The robbery was perpetrated by two black men, one about 6 feet 3 inches tall and the other approximately 5 feet 7 or 8 inches tall. Both men wore homemade masks over their faces. The employees, except the manager, were ordered into a utility room in the building. The taller man brandished a gun while the shorter man ordered the restaurant manager to open the cash drawers and took the money.

On September 27, 1979, the defendant and Elizabeth Hipple were stopped by police near 49th and Claire

Streets in Lincoln, pat-searched, and taken to police headquarters for questioning concerning the Burger King robbery. After lengthy questioning Hipple gave a statement to police in which she admitted that she, the defendant, and Kevin Ginger had committed the robbery. According to Hipple, on the evening of September 16, 1979, she, the defendant, and Ginger drove around the north part of Lincoln in her automobile while the defendant and Ginger discussed robbing the Burger King Restaurant. Ginger showed Hipple a homemade mask made out of a T-shirt that he intended to wear. Hipple saw the defendant remove a pistol from his pocket, place a bullet in the chamber, and put the pistol back in his pocket.

Late that evening the car was parked at 25th and Dudley Streets, and the defendant and Ginger left the automobile. Hipple waited in the car at 25th and Dudley for an estimated 1 to 1½ hours. When the defendant and Ginger returned to the car the defendant directed her to open the trunk, and the defendant and Ginger climbed into the trunk. She then drove to Ginger's apartment. When they arrived at the apartment she opened the trunk, and the defendant and Ginger got out. Hipple stated that there was money strewn around the trunk. The three of them picked up all the money and went into Kevin Ginger's apartment where the defendant counted the money and divided it. Hipple received about $500. Hipple and the defendant spent the remainder of the night at Ginger's apartment, and left early the next morning.

Approximately five Burger King employees, including the manager, were in the building at the time of the robbery. They testified, in substance, that shortly after closing, when one of the employees was taking out the trash, two men accosted him in the alley behind the restaurant and forced him back into the building. The men ordered the employees, except the manager, into a utility room. The taller robber grabbed the manager and demanded to know where the money was. The

shorter man then took over the task of getting the money, going up to the front of the restaurant with the manager, while the tall man stood at the back, holding the gun and making threatening comments. After the shorter man had obtained the money, both men left and the police were called. The testimony of the employees corroborated Hipple's testimony as to what the defendant had told her about what had happened inside the restaurant during the robbery.

Hipple testified that while the police were following her automobile on the night of the arrest, the defendant handed a .38-caliber automatic pistol to her and asked her to hide it. Hipple hid the gun in the front of her jeans, and it was not found during the pat-search. Later, while she was being questioned at the police station, she requested permission to use the bathroom, and hid the gun in a wastebasket. Sometime later she advised her attorney about the gun. The attorney notified the police who then retrieved the gun.

In exchange for her testimony as a witness for the State, Hipple was granted immunity from prosecution "from anything that arose out of the transaction that took place involving the Burger King robbery or incidents related thereto." There was some testimony at the trial that she would not be charged with being a felon in possession of a firearm and carrying a concealed weapon, but at the end of the trial it was stipulated that "the County Attorney's Office is still empowered to file said charges."

Before the trial commenced, defense counsel made a motion in limine to forbid the State's witnesses from using the words "polygraph" or "polygraph room" in their testimony. The motion was sustained and the county attorney was ordered to advise his witnesses to use the words "interview" or "interview room" in their testimony. During the trial Detective Van Butsel used the words "polygraph room" twice in his testimony. At a hearing on the defendant's motion for a mistrial, Van Butsel testified that he had not been told by the county

attorney to not use those words. The motion for mistrial was overruled.

At trial the defendant's counsel offered evidence of other robberies which had occurred in Lincoln while the defendant was in jail and unable to post bond. The method of operation used in these robberies was similar in nature to the Burger King robbery. A motion in limine by the State to prevent the introduction of this evidence was sustained.

After arraignment, the defendant waived a preliminary hearing in exchange for the county attorney's promise to turn over all police reports concerning the robbery. At the sentencing hearing in August 1980, defense counsel discovered, from the presentence report, that he had not received a number of police reports, some of which contained material which he thought was exculpatory. Sentencing was deferred, and a motion for new trial based on newly discovered evidence was filed. After a hearing on the motion, the motion was overruled.

In his first assignment of error the defendant contends the trial court erred in sustaining the State's motion in limine regarding evidence of similar, unsolved robberies in Lincoln which were committed while defendant was in jail and unable to post bond. The defendant argues this evidence was admissible to show lack of identity because "nearly identical robberies" were being perpetrated while the defendant was in jail.

The evidence offered related to robberies at Taco John's and Marion's liquor store in Lincoln, Nebraska. These robberies were committed by two black men, one tall and one short, near closing time, and in each robbery the shorter man took the money. At the hearing on the motion, the witnesses to the Taco John's robbery were unable to give as complete a description of the robbers as was the witness to the Marion's robbery. The evidence is that the robbers at Taco John's did not wear masks, although they did at Marion's.

The State argues that the subsequent robberies were too remote in time or not sufficiently similar to the Burger King robbery for the evidence to be admissible. Generally, it is within the discretion of the trial court whether evidence of other crimes is admissible. *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). It is also within the discretion of the trial court whether other offenses are sufficiently similar to the one charged so that evidence of the other offenses has probative value.

In determining whether evidence of other crimes is admissible, important considerations are remoteness in point of time and unique, almost "signature-like" similarity between the charged crime and the other crimes. *Commonwealth v. Murphy*, 282 Mass. 593, 185 N.E. 486 (1933). In the present case, the subsequent robberies occurred at Taco John's on November 18, 1979, 2 months after the Burger King robbery, and at Marion's liquor store on January 28, 1980, 4 months thereafter. While there were similarities among elements of all the robberies, there were also a number of dissimilarities. The parties were dressed differently; in some cases they wore masks and not in others; and in only two of the robberies was a gun used. There was evidence that an employee present at the Taco John's robbery had made a positive identification of one of the robbers, but the employee did not testify at the hearing in this case. We believe the three robberies were not so uniquely similar as to be sufficiently probative of defendant's innocence of the Burger King robbery that it was an abuse of discretion to sustain the motion.

In his second assignment of error the defendant contends the trial court erred in failing to declare a mistrial when the State's witness, Van Butsel, twice used the term "polygraph room" in describing where the gun was found which Hipple had hidden in the restroom at the police station. The defendant argues that the jurors could have inferred that Hipple had been in the polygraph room, or had taken a polygraph examination. Aside from describing the basement restroom as near

the polygraph room, Van Butsel's testimony in no way connected Hipple with the polygraph room. Although Van Butsel testified that he had not been told of the court's order in limine, neither Van Butsel's testimony nor that of any other witness placed Hipple in the polygraph room, or in any way indicated that she had taken a polygraph examination. The violation of the order did not result in substantial prejudice to any of the defendant's rights.

The defendant next contends that a new trial should have been granted because the State failed to disclose statements made by Kevin Ginger, in direct violation of the court's pretrial order; because the State failed to disclose "exculpatory" material contained in police reports regarding two black males in a blue station wagon who had been hanging around the Burger King restaurant for 2 days prior to the robbery; and because of information regarding Shelley Snyder's possible complicity in the robbery of the Burger King.

The statements of Kevin Ginger, which were not furnished to the defendant, contained a version of events taking place immediately before the robbery which was substantially at variance with the testimony of Hipple.

The reports concerning the blue station wagon and the possible complicity in the robbery by Shelley Snyder, a Burger King employee, were not in the possession of the county attorney until the sentencing hearing, 4 months after trial.

Although Kevin Ginger's statement contained in the police report conflicted with Hipple's testimony, it implicated the defendant in the Burger King robbery. In *Evans v. Janing*, 489 F.2d 470 (8th Cir. 1973), the Eighth Circuit stated: "[T]he sole purpose for which the police report might have been used in evidence would have been to impeach the testimony of the key witness. . . [S]uppressed *impeachment evidence* requires a higher standard of materiality than would be imposed for evidence directly related to guilt. 'As to evidence [admissible] only for the purpose of impeachment or

credibility attack, nondisclosure or suppression, to be violative of due process, would in our opinion, unless the situation is otherwise tainted, have to be of such inherent significance as to represent fundamental unfairness.'"

In *United States v. Agurs*, 427 U.S. 97, 111-13, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the U.S. Supreme Court stated: "[T]he fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. . . . [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."

Hipple's out-of-court statements made prior to trial contained a number of inconsistencies as compared to her testimony at trial. She was cross-examined thoroughly as to them by the defendant's counsel in an attempt to impeach her credibility. When the record as a whole is considered, the evidence against the defendant was substantial. We do not believe the suppression of the police report containing the statements of Ginger was prejudicial to the defendant.

As to the other "exculpatory material" contained in the police reports, the parties admit that the county attorney did not have these reports in his possession until long after trial. The information about the blue station wagon and the possible complicity of Snyder were early leads which the police abandoned. In *Moore*

*v. Illinois*, 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1971), the U.S. Supreme Court stated: "We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Here, the elusive 'Slick' was an early lead the police abandoned when eyewitnesses to the killing and witnesses to Moore's presence at the Ponderosa were found." The "exculpatory material" contained in the police reports was at best vague and insubstantial. Even if the county attorney had known of these reports before trial, the failure to disclose them to the defense would not have been prejudicial error.

The defendant's fourth assignment of error is that the trial court erred in not granting a new trial because of the State's failure to disclose the true nature of the plea bargain made with Elizabeth Hipple in exchange for her testimony. This assignment is argued in conjunction with the assignment that the trial court erred in not granting a new trial because of "prosecutorial misconduct in presenting the testimony of Elizabeth Hipple as true, when the prosecutor knew that she had failed a polygraph examination regarding her involvement in the robbery."

The defendant contends that conflicting statements made by the county attorney as to the extent and nature of Hipple's plea bargain constituted "false evidence" knowingly presented by the State.

Of the charges which could have been filed against Hipple, robbery and use of a firearm had definitely been dropped in exchange for her testimony. As to carrying a concealed weapon and felon in possession of a firearm, the parties stipulated that the county attorney was still empowered to file those charges against her. If this constituted "false evidence," any error was waived by the stipulation.

The defendant contends the county attorney incorrectly stated the nature of immunity available under Nebraska law in his closing argument and that this was

prejudicial to the defendant. We believe the allusion to "use immunity" in the final argument was not prejudicial. In *Kennedy v. State*, 171 Neb. 160, 175, 105 N.W.2d 710, 720 (1960), we said: "'Remarks of the prosecutor in final summation of the evidence to the jury which do not mislead and unduly influence the jury and thereby prejudice the rights of the defendant do not constitute misconduct.'" In *State v. Ellis*, 208 Neb. 379, 398, 303 N.W.2d 741, 753 (1981), we said: "'Although the prosecutor was less than artful at times, it does not appear that his conduct was meant to, or did, inflame the prejudices or excite the passions of the jury against the defendant.'"

The defendant also contends that the prosecutor knowingly presented false evidence by allowing Elizabeth Hipple to testify when he knew that she had failed a polygraph examination on the night of her arrest. After taking the polygraph examination, Hipple changed her story and admitted her participation in the robbery, which she had denied while taking the test.

The testimony Hipple gave at trial included her acknowledgment of her own participation in the robbery. The only time she denied her participation was before and during the polygraph examination on the night of her arrest. The same night, she admitted her own participation and continued to do so from then on.

As was noted in *State v. Oglesby*, 188 Neb. 211, 212, 195 N.W.2d 754, 755 (1972): "The fact an accomplice has been guilty of willful false swearing on a material matter does not automatically discredit his testimony as a matter of law in all cases. Ordinarily, his credibility is a question for the jury under a proper cautionary instruction." As we said in *State v. Leisy*, 207 Neb. 118, 128, 295 N.W.2d 715, 722 (1980): "The facts concerning [the accomplice's] background, motivation, credibility, and inconsistent statements were all before the jury. It was for them to determine the truth." The trial court did not err in refusing to grant a new trial on this ground.

The defendant's sixth assignment of error is that the trial court erred in not granting a new trial because of "prosecutorial misconduct in repeatedly vouching for the credibility of Elizabeth Hipple during questioning and during his statements to the jury."

The county attorney elicited from Hipple the fact that she understood that testifying for the State in this case meant giving testimony against the defendant, and that she understood that she was not immune from prosecution for perjury. In his closing argument the county attorney again noted that Hipple was not immune from prosecution for perjury. The defendant contends this testimony and the closing remarks amounted to the prosecutor "vouching for the credibility" of Hipple's testimony.

*Kennedy v. State, supra,* states at 175, 105 N.W.2d at 720-21: "'An argument by a prosecuting attorney, which is based on the evidence and inferences drawn therefrom, does not ordinarily constitute misconduct.'" Hipple's testimony as to the conduct of the robbery substantially tracked the testimony of the eyewitnesses. From this the jury could infer that Hipple was telling the truth. The testimony and argument that she was not immune from prosecution for perjury was no more than a correct statement of the law. Neb. Rev. Stat. § 29-2011.01 (Reissue 1979). The trial court did not err in refusing to grant a new trial on this ground.

The defendant's final assignment of error is that the District Court erred in imposing consecutive habitual criminal sentences of 10 years on both counts when the two crimes arose out of the same incident. His argument is that the use of a firearm in the commission of a felony statute, Neb. Rev. Stat. § 28-1205 (Reissue 1979), is an enhancement statute, and that by finding the defendant to be an habitual criminal as to both the robbery and the firearms-use statute, the defendant's sentence was doubly enhanced. The defendant likens the situation to the statute which makes third-offense driving while intoxicated a felony, while the first two offenses are

misdemeanors. Neb. Rev. Stat. § 39-669.07 (Reissue 1978).

The fallacy is in the defendant's argument that his sentence is being "doubly enhanced for one offense." Section 28-1205, which forbids the use of a firearm in the commission of a felony, specifically states: "(3) The crime defined in this section shall be treated as a separate and distinct offense from the felony being committed . . . ." Even though the two charges of which defendant was convicted arose out of the same transaction, they were separate and distinct offenses. The defendant's "double enhancement" argument is without merit, and the sentence was proper.

The judgment of the District Court is affirmed.

AFFIRMED.

KRIVOSHA, C.J. and CLINTON, J., concur in result.