STATE OF NEBRASKA, APPELLEE, V. JOSEPH P. MONIZ, APPELLANT.
397 N.W.2d 37

Filed December 5, 1986.    No. 86-186.

S.J. Albracht, for appellant.

Robert M. Spire, Attorney General, and Mark D. Starr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Following a bench trial, defendant, Joseph P. Moniz, was found guilty of second degree murder in violation of Neb. Rev. Stat. § 28-304 (Reissue 1985) and sentenced to life imprisonment. His three assignments of error raise two issues: (1) whether the killing was justifiable as having been committed in self-defense; and, if not, (2) whether the evidence supports a conviction for second degree murder. We affirm.

Defendant testified that he, an unemployed, disabled man suffering from back problems and emphysema, and decedent, Gerald Jump, a younger, robust individual, had been longtime

friends and had been standing at the bar of the Horseshoe Lounge in Walthill visiting and buying each other drinks. All at once decedent turned to defendant and said, "You ugly Son-of-a-Bitch, I'm going to whip you." Decedent continued "picking" on defendant and bragged about how he had "whipped" defendant's son and could "whip" any of the Monizes. Defendant then rejoined his daughter, Tracy Moniz, her boyfriend, Fred Appleton, and defendant's nephew, Frank Stabler, at a booth. Decedent went over to the booth on three separate occasions, "cussing" and "laughing" at defendant and sticking his fingers into defendant's drink. While this caused defendant to stand up so as to face decedent, there was no hitting or pushing, and defendant and Stabler ultimately left the lounge. However, because defendant had left the keys to his car at the booth, he beckoned through the picture window at the front of the lounge to his daughter to come outside so that he could retrieve his keys.

Once at home, defendant and Stabler decided they wanted more beer, so they drove back to the lounge. Although defendant expected no more trouble because he thought decedent would have left the lounge by that time, he nonetheless asked Stabler to go in the lounge and get the beer while he remained in the car. Decedent and his friend, Mark Morgan, then came out of the lounge. Decedent started toward defendant while defendant was still in the car, but Morgan pulled decedent back onto the sidewalk. Defendant, who had by this time gotten out of his car, was struck about the head several times by decedent. Becoming afraid decedent, who had a reputation for being a mean fighter, was going to cripple him, defendant took out his knife, an instrument with a 4- to 5-inch locking blade, and "just started cutting."

There was other evidence, however, from which the trier of fact could find that all was peaceful in the lounge for approximately 30 minutes after defendant returned to the booth. Defendant and decedent then began to argue with each other across the room. Decedent went over to defendant's booth at least twice, during which encounters some shoving occurred. The bartender, Donald French, his nephew, Tim French, and Morgan attempted to separate defendant and

decedent and stop the argument. Finally, at approximately 11 p.m., the bartender asked defendant to leave. By this time defendant and decedent had been at the lounge approximately 5 hours.

Once outside the lounge, defendant, as he passed in view of the large picture window in the front of the lounge, made a motion with his hands toward someone, presumably decedent, which suggested that defendant wanted decedent to come outside. No one responded, except that Tim French went outside to again ask defendant to leave because he did not want any more trouble at the lounge. French further testified that at this time defendant replied that there was going to be trouble because he was going to "gut" decedent. Defendant then walked toward his home, while decedent remained in the lounge and continued to drink.

Approximately 30 to 40 minutes later, defendant's son, "Young Joe" Moniz, went into the package area of the lounge. Tim French testified that Young Joe wanted decedent outside for a fight but that French restrained Young Joe from entering the bar area. By this time defendant and Stabler had returned in defendant's car and parked outside the lounge.

Decedent finished his drink, took off his glasses and possibly his hat, laid them on the bar, and started for the door. Decedent stated he was "going to have to take care of this matter." Morgan and the Frenches attempted to keep decedent from leaving the lounge, but decedent said he was going home and that they could not stop him from doing that. Morgan accompanied decedent as he left the lounge, and the bartender called the police.

A fight involving decedent, defendant, Morgan, Stabler, and Young Joe then began outside the lounge. The Frenches and Morgan testified that as decedent and Morgan exited the lounge, both defendant and Stabler got out of the car and started toward the two men. Although all of the men were bunched together in the scuffle, the first "challenge" appeared to have been between Young Joe and decedent. Defendant was struck on the face by decedent, perhaps as the result of defendant's stepping in front of a punch intended for Young Joe. Defendant then grabbed decedent by the collar and shoved

him toward a wall.

At some point in the scuffle defendant pulled out his knife. According to Morgan, defendant repeated two or three times to decedent, "I'm going to gut you," and when Morgan tried to take the knife from defendant, defendant repeated the same to Morgan. Decedent had no weapon. Morgan saw defendant strike decedent three times in the face with the knife. Defendant may also have stabbed decedent in the stomach. At some point after decedent had been cut, he uttered something to the effect, "This is not funny, Joe, quit it, I can hurt you too," or "You think that is funny, huh?" Finally, decedent fell into the doorway of the building.

Morgan testified that after decedent fell, Young Joe stated, "It is over with now." Defendant and Stabler then got into defendant's car and drove away.

Decedent died from the loss of blood which resulted from three stab wounds in the left chest, one stab wound beneath the right rib margin, and one stab wound in the back. Decedent also suffered face lacerations. Defendant suffered face abrasions and a cut inside his lower lip.

The sheriff testified that, in discussing the matter with him following his arrest, defendant admitted he had stabbed decedent and that he knew he had done wrong and had to pay for it. Defendant also told the sheriff that he was in his car when the decedent "started in" on him and that he asked decedent to leave him alone. When the decedent "popped him" in the mouth, defendant warned decedent he would "cut him."

The first issue, whether the killing was justifiable self-defense, rests upon Neb. Rev. Stat. § 28-1409 (Reissue 1985), which provides in part:

> (1) Subject to the provisions of this section and of section 28-1414, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> . . . .
>
> (4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is

necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat, nor is it justifiable if:

. . . .

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . .

In reviewing this matter we must bear in mind that the factual findings of a judge who serves as the trier of fact in a criminal case will not be disturbed on appeal unless clearly wrong. See, *State v. Williams, ante* p. 114, 396 N.W.2d 114 (1986); *State v. Goodon,* 219 Neb. 186, 361 N.W.2d 537 (1985); *Bordeau v. State,* 125 Neb. 133, 249 N.W. 291 (1933).

Defendant's own version of the occurrence provides ample basis for the trial judge's conclusion that the killing was not justifiable self-defense. Defendant himself testified that he was in his car when he saw decedent start toward him. Defendant also saw decedent being pulled back by Morgan, knew that he and decedent had spent 5 hours arguing with each other, and by his own words knew decedent was a mean fighter. Defendant also knew he could avoid the necessity of using force with complete safety by retreating as contemplated by § 28-1409(4)(b). All defendant would have needed to do to retreat was to lock and remain in his car or to drive away.

In a similar case, *State v. Kuntzelman,* 215 Neb. 115, 337 N.W.2d 414 (1983), this court concluded it was not error to refuse to instruct the jury as to the elements of self-defense. In *Kuntzelman* the victim and his companions had been harassing the defendant and a group of his companions. During the chain of events leading to the killing, the defendant and his friends had locked the doors of the van in which they were traveling and had fled from the victim and his friends. After concluding that another friend had been left behind and might be in danger, the defendant secured a shotgun and returned with the others to the earlier scene. The victim and his companions were still at the scene. The defendant discharged the shotgun twice into the air and shouted "get out of here." The victim then began advancing on the defendant, stating, "You haven't the courage to shoot me." Defendant proved the victim wrong by shooting him from a distance of 12 to 14 feet. In reaching its decision this court

relied in part on the fact that the defendant could have retreated to the safety of his van.

Since there is evidence to support a factual finding that defendant knew he could avoid the necessity of using force with complete safety by retreating, the trial judge's conclusion with respect to the first issue is not clearly wrong, and, thus, that issue is resolved adversely to defendant.

In connection with the remaining issue, defendant argues that while the evidence may establish he committed manslaughter, it falls short of establishing he committed murder in the second degree.

Section 28-304 provides that one commits murder in the second degree if he or she "causes the death of a person intentionally, but without premeditation." Neb. Rev. Stat. § 28-305 (Reissue 1985) provides that one commits manslaughter if he or she kills another "without malice, either upon a sudden quarrel, or causes the death of another unintentionally while in the commission of an unlawful act."

In making our analysis we are guided by the principle that in determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the trier of fact, and a finding made by the trier of fact must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Kern, ante* p. 177, 397 N.W.2d 23 (1986); *State v. Baker, ante* p. 130, 395 N.W.2d 766 (1986); *State v. Borchardt, ante* p. 47, 395 N.W.2d 551 (1986). Further, a finding of guilt may not, as a matter of law, be set aside on appeal for insufficiency of the evidence if that evidence sustains some rational theory of guilt. See, *State v. Kern, supra; State v. Joy,* 220 Neb. 535, 371 N.W.2d 113 (1985). Thus, we concern ourselves not with whether the evidence would have supported a conviction for manslaughter but whether it supports a conviction for the degree of murder the trial judge as the trier of fact found to exist.

We have held that the essential elements in the crime of murder in the second degree are that the killing be done

purposely and maliciously. *State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983). Malice, in the context of second degree murder, has been said to denote that condition of mind which is manifested by the intentional doing of a wrongful act without just cause or excuse, *State v. Rowe, supra*, and to be " 'any willful or corrupt intention of the mind.' " *Housh v. State*, 43 Neb. 163, 168, 61 N.W. 571, 572 (1895).

In arguing that the evidence fails to show the killing of the decedent to have been purposeful and malicious, defendant overlooks the fact that these elements may be inferred from the evidence relating to the circumstances of the criminal act. See, *State v. Rowe, supra; State v. Clermont*, 204 Neb. 611, 284 N.W.2d 412 (1979).

There is evidence that defendant made a conscious decision to "gut" decedent and did precisely that. That circumstance alone supports the conclusion that the killing was the intentional result of defendant's willful act of attacking decedent with a knife. Thus, the evidence supports a finding that the killing was done purposely and maliciously.

The judgment and sentence of the district court are therefore affirmed.

AFFIRMED.

GRANT, J., dissenting in part.

I agree with the holding of the court that defendant's act of killing was not justifiable as self-defense. I dissent from the holding of the court affirming the trial court's determination that defendant's act constituted second degree murder.

This court has stated that " 'malice and intent may be inferred from the evidence relating to the circumstances of the criminal act.' " *State v. Rowe*, 214 Neb. 685, 690, 335 N.W.2d 309, 313 (1983). The malice sufficient to support a finding of guilt in the second degree murder in the *Rowe* case was shown by the victim's fractured skull, a potentially lethal injury, which, however, did not cause death because the victim (Rowe's wife) bled to death from a large incision from below the breastbone to the pubic area and the partial amputation of the victim's left breast.

In *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977), cited in *State v. Rowe, supra*, a conviction of murder in the

second degree also was affirmed. In *Partee* the finding of defendant's malice was based on the fact that the victim (the wife of Partee) was "brutally and relentlessly beaten, and part of her scalp was torn away." 199 Neb. at 312, 258 N.W.2d at 639.

In this case the relationship of defendant and decedent as friends disintegrated, after 5 or 6 hours of drinking, into a drunken brawl resulting in this senseless killing. In my opinion, as a matter of law, the 62-year-old debilitated defendant displayed no more "malice" toward the 31-year-old robust decedent than that displayed by any participant in such an unevenly matched brawl or "sudden quarrel." Defendant did not display malice which would warrant a conviction of second degree murder.

In my opinion defendant was guilty of the crime of manslaughter and should have been sentenced accordingly.