STATE OF NEBRASKA, APPELLEE, V. CLAYTON KERN, APPELLANT.
397 N.W.2d 23

Filed December 5, 1986.   No. 85-876.

Bernard J. Ach and Patrick J. Craven, for appellant.

Robert M. Spire, Attorney General, and Dale A. Comer, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

A jury found defendant, Clayton Kern, guilty of first degree murder in violation of Neb. Rev. Stat. § 28-303(1) (Reissue 1985). He was thereafter so adjudged and sentenced to life imprisonment. The errors assigned to the district court question (1) its failure to grant a change of venue, (2) certain of its evidentiary rulings, and (3) its failure to find the evidence insufficient to prove the charge. The record does not sustain the errors assigned, and we therefore affirm the judgment and sentence of the district court.

Defendant had known for approximately a month prior to the killing that his wife, Theresa, intended to divorce him. Once he acquired that knowledge, defendant began treating his wife and adopted 11-year-old daughter, Laura, who was his wife's natural child, more kindly. He also asked Barbara Nigg, a close friend and neighbor, to help the couple reconcile.

When it became apparent that his wife would not reconsider her decision concerning the divorce, defendant searched for another living arrangement. While he continued to live with his wife at their Crete apartment, defendant had, on May 16, 1985, made a deposit for the rental of another apartment in the same city.

On the day of the killing, May 18, 1985, in the presence of defendant's nephew, Scott Kern, and Cherryl Woodard, one of Theresa Kern's sisters, defendant wrote a note which provided that in the event of his death Woodard was to receive any money owed to him by his employer. Defendant also stated he intended to have his employment insurance made payable first to Woodard, then to his daughter. He asked that in the event of his death Woodard give his wife $200 per month for the daughter's care. Upon his wife's death, Woodard was to use the money to care for the daughter. Defendant also told Woodard that she was to use part of the money to buy three burial plots and asked her to promise to bury him next to his wife.

On May 1, 1985, defendant had informed Woodard that he would rather see his wife dead than with anyone else. He also told another of his wife's sisters, Geraldine Deeringer, that he could not live without his wife and could not stand losing her. At another time during that month, "out of the clear blue," defendant had begun laughing and told Nigg he knew how to get even with his wife; he would get a spot next to where she was to be buried, and he would be buried beside her.

During the afternoon of the day of the killing, the daughter asked if she could spend the night with Woodard so that she could attend her cousin's graduation the next day. Defendant replied affirmatively, saying that he was going to let her stay at a friend's anyway if she had asked. The evidence also establishes that it was not unusual for the daughter to spend weekends with friends, and she had also not been at home the night before the killing.

Sometime before midnight on the night of the killing, defendant arrived at Woodard's residence in Ashland and wanted both Woodard and his daughter to come with him. After unsuccessfully attempting to arouse his daughter, defendant and Woodard got into defendant's automobile and began riding around. Once on the road, defendant told Woodard that he had killed his wife, stating that he had choked her to death back in their apartment when she had told him she was in love with another man. Woodard initially did not believe defendant and asked if he had been able to find a pulse. Defendant replied he had not checked for one. Woodard also

asked whether he had seen her sister's stomach move, and defendant replied that he thought he had.

Defendant and Woodard then proceeded to search for a telephone, and found one at a Greenwood bar. At the bar Woodard telephoned the Niggs and asked them to confirm whether her sister was in fact dead. Defendant then telephoned a friend, LeRoy Dimmitt, and told Dimmitt that he was in trouble because he thought he had killed his wife. Defendant also made arrangements for his nephew to come to the bar and pick up Woodard.

After those telephone calls had been made, defendant flagged down state patrolman Ronald Balthazor, who, in response to a telephone call placed by the bar owner, had been on his way to a "disturbance" at the bar. Defendant was highly agitated and began yelling, "I killed her, I killed her, I killed my wife with my own hands, I choked her to death." Defendant was then given the *Miranda* warnings, after which he stated to Balthazor that he was sure his wife was dead. When asked if he had given her any medical attention, he replied, "No, I killed her."

Defendant was later taken to the county-city jail in Lincoln for further questioning and was again given the *Miranda* warnings. According to Ronald Boardman, who questioned defendant in Lincoln, defendant stated that on the evening of the killing he and his wife had been at their apartment watching television and talking about their divorce. At what he believed to be 9 p.m., the wife said that they would make love one last time and left the room, returning undressed. While the couple was hugging and kissing, the wife told defendant she was still in love with another man. At that point defendant "lost it" and killed his wife. Defendant then carried the body into the bedroom, placed it on the bed, and planned to commit suicide. He got a knife from the kitchen, returned to the bedroom, and lay down beside his wife, but could not kill himself. Defendant then wrote a note, which was found on the headboard of the bed.

In the note defendant asked Woodard to forgive him and to take care of the things they had talked about. The note also said that while he and his wife were in bed, she said she and her lover

might get back together again, and when she said this he "just went nuts." The note went on to say he thought his wife might still be alive, and asked for help for himself and his wife if he should not succeed in his effort to kill himself. The note also observes that he was unable to kill himself. After writing the note, the defendant went to Woodard's house.

Robert Loveless, the wife's brother, testified he talked on the telephone with both defendant and his sister between 9 and 9:30 that evening and that both seemed normal.

The first assignment of error rests upon Neb. Rev. Stat. § 29-1301.01 (Reissue 1985), which provides:

> If any person shall commit an offense against the person of another, such accused person may be tried in the county in which the offense is committed, or in any county into or out of which the person upon whom the offense was committed may, in the prosecution of the offense, have been brought, or in which an act is done by the accused in instigating, procuring, promoting, or aiding in the commission of the offense, or in aiding, abetting, or procuring another to commit such offense.

The trial judge overruled the motion for a change of venue before the jury was selected. He reserved the opportunity, however, to rule differently later.

Defendant recognizes this court has ruled that a motion for change of venue filed pursuant to the foregoing statute is addressed to the sound discretion of the trial court, whose ruling will not be disturbed absent a clear abuse of that discretion. See, *State v. Heathman, ante* p. 19, 395 N.W.2d 538 (1986); *State v. Irish,* 223 Neb. 578, 391 N.W.2d 137 (1986); *State v. Navarrete,* 221 Neb. 171, 376 N.W.2d 8 (1985); *State v. Williams,* 205 Neb. 56, 287 N.W.2d 18 (1979). *State v. Irish, supra,* further provides that a "trial court abuses its discretion in denying a motion for change of venue where the defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair trial." *Id.* at 583, 391 N.W.2d at 141. The factors used to determine whether a change of venue should have been granted due to pretrial publicity include:

> "[T]he nature of the publicity; the degree to which the

publicity has circulated throughout the community; the degree to which the publicity circulated in areas to which venue could be changed; the length of time between the dissemination of the publicity complained of and the date of trial; the care exercised and ease encountered in selection of the jury; the number of challenges exercised during the voir dire; the severity of the offense charged; and the size of the area from which the venire is drawn."

*State v. Navarrete, supra* at 173-74, 376 N.W.2d at 10 (quoting *State v. Fallis*, 205 Neb. 465, 288 N.W.2d 281 (1980)). Accord *State v. Heathman, supra*. Defendant invites us, however, to overrule those cases and in effect hold that a change of venue should be granted whenever a criminal defendant claims he cannot get a fair trial absent such a change, irrespective of what the evidence may show. We decline to do so, and adhere to the long-settled law of this state in considering this issue.

Defendant introduced three newspaper articles concerning the killing in support of his motion for a change of venue. Two of the articles were from Lincoln newspapers. They presented a small photograph of defendant and did little more than report the killing, the circumstances of the arrest, and the fact that a bond hearing had been held. The third article appeared in The Crete News and contained a number of photographs, including those of the defendant, his wife, the attorneys involved, and the entrance to the apartment at which the killing took place. The article gave some biographical information concerning those pictured, detailed the legal proceedings had to the date of publication, and gave the location and time of the funeral. The newspaper articles were all published within 10 days of the killing, and none contained any unduly inflammatory material.

Defendant also submitted eight affidavits in support of his motion. These documents concluded that because of The Crete News article and the community conversation about the killing, an impartial jury could not be selected.

Not only was the issue not raised during or after the jury was selected but no difficulty in selecting an impartial jury was experienced. Six of the jurors had no prior knowledge of the case. The remaining six had read newspaper accounts of the killing, but had either formed no opinion or indicated in

various ways that they could decide the case on the evidence. A juror need not be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impressions or opinion and render a verdict based on the evidence presented in court. *State v. Navarrete, supra; Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).

The trial judge did not abuse his discretion in overruling defendant's motion for a change of venue, and there is therefore no merit to the first assignment of error.

This brings us to the second assignment of error, that the trial court erred in certain of its evidentiary rulings. We begin our analysis of this assignment by recalling that the admission or exclusion of evidence is a matter left largely to the sound discretion of the trial judge. *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986). Defendant argues the trial judge abused his discretion in a variety of respects.

The first of these claimed errors concerns the admission of the testimony of Carolyn Garber, defendant's wife at a former time. Garber testified that on March 18, 1975, after she had told defendant she was involved with another man and while the couple was living apart and in the process of divorcing, defendant broke into her trailer home and forced her into a bedroom, saying "if I can't have you, no other man can." He then placed a pillow over her face in an apparent effort to suffocate her. However, he stopped and began sobbing. When Garber tried to escape, defendant ran after her, caught her, threw her down, seized her throat, and attempted to choke her. She passed out, and when she came to, found she was alone.

At a later time, but before the divorce decree, defendant went to Garber's home with a gun and said he was going to kill her and then commit suicide. She told him she wanted to take the children to a neighbor and would return so they could talk. While on the way to the neighbor's, she heard a gunshot and called the police when she arrived at the neighbor's house.

Defendant argues that the foregoing evidence as to his conduct with Garber is so remote in time and dissimilar in circumstances as to not be admissible on the issue of his guilt of the crime with which he is charged in this case.

Neb. Rev. Stat. § 27-404(2) (Reissue 1985) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

It is well established that § 27-404(2) is an inclusionary rule permitting the use of relevant other crimes, wrongs, or acts for all purposes except to prove the character of a person in order to show that such person acted in conformity with that character. Thus, § 27-404(2) permits evidence of other crimes, wrongs, or acts if such is relevant for any purpose other than to show defendant's propensity or disposition to commit the crime charged. *State v. Robb, ante* p. 14, 395 N.W.2d 534 (1986); *State v. Hunt,* 220 Neb. 707, 371 N.W.2d 708 (1985); *State v. Stewart,* 219 Neb. 347, 363 N.W.2d 368 (1985); *State v. Craig,* 219 Neb. 70, 361 N.W.2d 206 (1985). This rule predates the 1975 adoption of § 27-404(2). See, for example, *Sall v. State,* 157 Neb. 688, 61 N.W.2d 256 (1953); *Adams v. State,* 138 Neb. 613, 294 N.W. 396 (1940).

In applying § 27-404(2) we have said that evidence of other crimes, wrongs, or acts may be admitted where the evidence is so related in time, place, and circumstances to the offense charged as to have substantial probative value in determining the accused's guilt of the offense in question. *State v. Hunt, supra; State v. Keithley,* 218 Neb. 707, 358 N.W.2d 761 (1984); *State v. Ellis,* 208 Neb. 379, 303 N.W.2d 741 (1981). At times, we have equated the foregoing more complete statement of the rule with language that there must exist "unique, almost 'signature-like' similarity between the charged crime and the other crimes." *State v. Dandridge,* 209 Neb. 885, 890, 312 N.W.2d 286, 291 (1981); *State v. Coca,* 216 Neb. 76, 341 N.W.2d 606 (1983).

We have also observed that the admissibility of evidence concerning other conduct must be determined upon the facts of each case and that no exact limitation of time can be fixed as to when other conduct tending to prove intent to commit the offense charged is remote. The question of remoteness in time is largely in the sound discretion of the trial court; while

remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence. As is generally true on questions concerning the admissibility of evidence, the question of whether other conduct is sufficiently similar to the offense charged is also a matter left largely to the sound discretion of the trial court. See, *State v. Hunt, supra; State v. Keithley, supra; State v. Ellis, supra.*

As the later discussion concerning the third assignment of error demonstrates in greater detail, defendant questions the adequacy of the evidence to establish that he either premeditated or intended the killing. That challenge distinguishes this case from *State v. Robb, supra*, which held evidence of a prior act less remote in time than those involved in the present case to be inadmissible. In *Robb* there was nothing to bring into question the assumption that one of sound mind intends the obvious and probable consequences of his or her voluntary acts. In the present case defendant asserted throughout that he neither planned the murder nor intended the obvious and probable consequences of his voluntary acts. Thus, how defendant responded in similar circumstances in the past is relevant on the issue of what he planned and intended in the present instance. The circumstances were sufficiently similar to make the evidence of his earlier conduct probative on the issue of his guilt of the offense charged. Defendant expressed much the same thought to Garber that he expressed to Woodard with respect to the victim in this case: if he could not have her, no other man could. In each instance his then wife was involved with another man. In each instance a divorce was pending. In each instance defendant resorted to the act of choking.

We recognize that Neb. Rev. Stat. § 27-403 (Reissue 1985) provides for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice. In that connection we conclude that in view of defendant's challenge to the presence of the requisite premeditation and intent and of the other evidence bearing on the issue, admission of defendant's attacks on Garber did not result in unfair prejudice to him.

Defendant also argues that the trial judge erred in at least 31 separate instances by admitting inadmissible evidence and in permitting prosecutorial misconduct by tolerating repetitive questioning which resulted in the admission of cumulative evidence. Defendant postulates correctly that while any one of several errors may not, in and of itself, warrant a reversal, if all of the errors in the aggregate establish a defendant did not receive a fair trial, a new trial must be granted. *State v. Davis*, 185 Neb. 433, 176 N.W.2d 657 (1970). The question, thus, is whether in the aggregate the claimed errors denied defendant a fair trial.

A study of the claimed errors reveals that in some instances either defendant's objection was sustained or the question was withdrawn by the prosecutor. The bulk of the remaining objections related either to the form of the question concerning evidence which was otherwise admissible or to the cumulative nature of the evidence sought. None of the cumulative evidence received was unduly inflammatory, and most of it related to the fact that defendant's wife was dead, a fact no one disputed. While it is true that once the death had been proved, no useful purpose was served by proving it again, it cannot be said that re-proving the death deprived defendant of any substantial right. The few substantive objections which were overruled elicited responses related to inconsequential matters not at issue, and therefore did not prejudice defendant.

We must conclude that the trial judge's evidentiary rulings did not constitute an abuse of discretion and did not deny defendant a fair trial. Thus, there is no merit to this assignment of error.

The third and last assignment of error questions the sufficiency of the evidence to support the conviction. Defendant does not claim he did not kill his wife, but does claim the evidence fails to demonstrate that he either premeditated or intended the killing.

In resolving the issue presented by this assignment, it must be remembered that in determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh

the evidence. Such matters are for the trier of fact, and a finding made by the trier of fact must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Moniz, post* p. 198, 397 N.W.2d 37 (1986); *State v. Ellis,* 223 Neb. 779, 393 N.W.2d 719 (1986); *State v. West,* 223 Neb. 241, 388 N.W.2d 823 (1986); *State v. Benzel,* 220 Neb. 466, 370 N.W.2d 501 (1985). See, also, *State v. Dondlinger,* 222 Neb. 741, 386 N.W.2d 866 (1986).

Premeditation, or the design and purpose to kill, exists when the intent to kill is formed before the act causing the death, and not merely simultaneously with that act. *State v. Jones,* 217 Neb. 435, 350 N.W.2d 11 (1984); *State v. Beers,* 201 Neb. 714, 271 N.W.2d 842 (1978). However, no particular length of time is required in order for premeditation to exist; the time used in premeditating may be so short as to be instantaneous, and the intent to kill may be formed at any moment before the killing. *State v. Benzel, supra.*

The facts that defendant told Woodard he would rather see his wife dead than with another man, that he asked that his money be used to care for his daughter in the event both he and his wife died, and that he expressed the wish to be buried next to his wife certainly permit a rational finder of fact to conclude that defendant both premeditated and intended the killing. Defendant argues that what he wrote after the killing clearly demonstrates he "went nuts" and, presumably, acted without any thought at all. A rational, unbiased finder of fact, however, could well conclude that the note itself was a planned effort to obfuscate the premeditation and intent the other facts imply. The fact that defendant sounded normal to Loveless before the killing does not establish defendant was not harboring a plan to kill his wife at the time nor that such a plan did not come into existence after Loveless talked with defendant.

The question of premeditation was for the jury to determine, *State v. Benzel, supra,* as was the question of intent, *Ward v. State,* 58 Neb. 719, 79 N.W. 725 (1899). After a jury has considered all of the evidence and returned a verdict of guilty, that verdict may not, as a matter of law, be set aside on appeal for insufficiency of evidence if the evidence sustains some rational theory of guilt. *State v. Moniz, supra; State v.*

*Wilkening*, 222 Neb. 107, 382 N.W.2d 340 (1986). See, also, *State v. Evans*, 215 Neb. 433, 338 N.W.2d 788 (1983).

As the foregoing discussion demonstrates, there exists a rational theory of guilt; consequently, there is no merit to this last assignment of error.

AFFIRMED.

KRIVOSHA, C.J., concurring in the result.

I concur in the result reached by the majority in this case. I write separately, however, because I do not agree with the majority's view regarding the admissibility of evidence of other bad acts. As I read the record, Kern did not contend that he had not strangled his wife, but only that he had not done so with premeditation. I simply find it difficult to see how one may say that evidence that Kern attempted to suffocate a former wife 10 years ago or threatened to kill her could prove that a subsequent act was done with premeditation. The question as to whether premeditation exists is a fact question directly related to the specific case and not to previous behavior. It seems to me that the most that can be said is that the evidence was offered to show how Kern reacts to a particular situation; that is, to show that he acts in conformity with his character. That is specifically what Neb. Rev. Stat. § 27-404(2) (Reissue 1985) says cannot be shown.

The majority attempts to distinguish this case from our decision in *State v. Robb, ante* p. 14, 395 N.W.2d 534 (1986). I simply cannot see that distinction, or how this evidence was not offered simply to show that Kern acted in a way consistent with his character. I therefore believe that the evidence was inadmissible.

I concur, however, because I believe that no prejudice resulted from the introduction of this evidence. The evidence of guilt in this case was simply overwhelming. There was simply no question that Kern killed his wife by strangling her. He admitted to that fact. It is difficult to conceive how he could maintain that that was accidental under the facts of the case. He admitted placing his hands around his wife's throat and strangling her until she was dead. That establishes premeditation. See, *State v. Lynch*, 215 Neb. 528, 340 N.W.2d 128 (1983); *State v. Worley*,

178 Neb. 232, 132 N.W.2d 764 (1965). I therefore concur in the result reached by the majority.